WHEELER et al. v. BILLINGS et al.

(Circuit Court of Appeals, Eighth Circuit. December 30, 1895.)

No. 554.

1. EQUITY PRACTICE—ACCOUNTING—DIRECT ACTION OF COURT.
It is not necessary that an account decreed in a suit in equity should be stated by a master, but it is within the discretion of the court, if for any reason it deems it proper to do so, to state the account itself, after an examination of the testimony taken by one or more masters.

2. SAME—APPORTIONING INTERESTS—ABSENCE OF PARTIES—FORM OF RELIEF.
The owners of the D. mining claim and the owners of sundry adjacent claims, between whom and the owners of the D. claim there had been disputes as to their respective rights in certain locations, organized the C. Mining Co., and conveyed to it their various rights in the disputed locations. One-half the stock was assigned to the owners of the D. claim. The other half was placed in trust for the owners of the other claims, who could not agree upon a division of the stock, with the understanding that an account should be kept of the ore taken from the several locations, and the proceeds, after deducting one-half for the owners of the D. claim, should be paid to the grantors of the several claims. Subsequently, in a suit brought by third parties against the assumed owners of the E. Mine, one of the locations, it was adjudged that an interest in the location belonged to such third parties. *Held* that, in the absence of some of the parties interested in the stock of the C. Mining Co. held in trust, the court could not, in such suit, apportion the stock so held, and direct a transfer of the shares, but that the most that could be done was to adjudge that the assumed owners of the E. Mine should transfer a proper proportion of such interest as they had in such stock to the parties found to have had an interest in the location.

3. RATIFICATION—UNAUTHORIZED SALE—ESTOPPEL.
*Held,* further, that said assumed owners of the E. Mine should not be excused from transferring to those found to be the true owners their interest in the stock of the C. Mining Co., on the ground that their transfer of the location to the C. Co. could be attacked, and the location recovered from the C. Co., by such true owners, since the latter, by claiming and accepting the stock, would be held to have ratified the sale, and to be estopped from taking such action to recover the location.

4. FRAUD—FOLLOWING PROCEEDS OF PROPERTY.
Large sums having been paid, under the agreement by which the stock of the C. Co. was placed in trust, to the assumed owners of the E. Mine, who were also owners of other claims sold to the C. Co., *held,* that the true owners of the E. Mine were entitled to recover from the assumed owners only such part of said money as could be shown to have been paid them as the proceeds of ore taken from the E. Mine.

5. SAME—SUCCESSIVE ACTORS—INDIVIDUAL—CORPORATION.
The assumed owners of the E. Mine, as against whom the true owners were adjudged to be entitled to the same, or the proceeds thereof, were one W., who held the mine for a time individually, and a corporation organized by W., to which he conveyed the mine, and of which he was a stockholder, officer, and active manager. *Held,* that no decree for the profits of the mine during the time of W.'s individual holding could be rendered against the corporation, but that a decree could properly be rendered against both W. and the corporation jointly for the profits of the period during which the mine was held by the corporation.

6. EQUITY PRACTICE—DEFENSE INTERPOSED OUT OF TIME—PROOF.
When a defense in an equity suit is withheld until a late stage in the litigation, after the issues, as at first raised, have been decided, and the

case is proceeding before a master, such defense, if its introduction can be permitted at all, must, in order to prevail, be established by evidence of the most satisfactory and convincing character.

Appeal from the Circuit Court of the United States for the District of Colorado.

This case was before this court at the October term, 1891, on appeal from a decree dismissing the bill of complaint. The decree appealed from was reversed, and the case was remanded to the circuit court, with instructions— First, "to permit William G. Scott, as representative of Matilda Scott, deceased, to become a complainant in the bill, and to require Richard J. Doyle to be made a defendant to the proceedings, in order that any right or claim he may hold to the property in dispute may be settled by the final decree herein"; second, to enter a decree "canceling the deeds and powers of attorney executed by Margaret Billings, James O. Wood, and Charles E. Wood to David Robertson, James Devereux, or other parties, purporting to convey their interests in the mining property in the bill described, and which are set forth in the bill herein filed,—said decree to declare and establish the rights and title of the widow and children of William J. Wood to the one-third of said Emma mining property, as against the defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company"; and, third, "to direct a proper accounting between the parties upon the basis of the rights thus decreed." 10 U. S. App. 1, 65, 2 C. C. A. 252, 264, 51 Fed. 338; Id., 10 U. S. App. 322, 3 C. C. A. 69, 52 Fed. 250. In obedience to the aforesaid order the circuit court on January 21, 1893, entered a decree which canceled the several deeds and powers of attorney referred to in said order, and established the title of the widow and children of William J. Wood, deceased, to an undivided one-third interest in said Emma Mine and mining claim, as against the appellants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, who were the defendants below. The decree of the circuit court further adjudged and determined that the appellees, who were the complainants below, "are entitled to * * * one-third of the entire proceeds of said mine and mining claim from the time the same became a productive mine to the date of this decree, after deducting all reasonable and necessary expenses and outlays by said Wheeler and said Aspen Mining & Smelting Company in the working and developing of said mine and mining claim, and in purchasing the necessary tools, engines, cars, and other mining machinery and necessary mining apparatus, and everything necessary to the working of said mine; * * * that said defendant Wheeler and said Aspen Mining & Smelting Company account to the said complainants for the value of one-third of all the capital stock of said Compromise Company, mentioned in the separate answers of said Wheeler and said Aspen Mining & Smelting Company to the said bill of complaint, which the said Wheeler and said company received in consideration of their conveying to the said Compromise Company that portion of the said Emma Mine and mining claim mentioned and described in the separate answer of the said Aspen Mining & Smelting Company; * * * and that the said complainants and said widow and children of the said William J. Wood, deceased, are entitled to the value of the one-third of the whole amount of the capital stock of the said Compromise Company received by said Wheeler and said Aspen Mining & Smelting Company in consideration of the said consolidation of the said portion of said Emma Mine and mining claim with other portions of mining ground owned by said Compromise Company, and for the purpose of mining all of said consolidated mining ground together and to better advantage, as shown by the said answers and pleadings in this suit; * * * that the said complainants and said widow and children of the said William J. Wood, deceased, are entitled to the one-third of all the dividends and sums of money received from time to time by said Wheeler and said Aspen Mining & Smelting Company from the said Compromise Company, from the time of its organization up to the present time, in consideration of the consolidation of said portion of said Emma Mine and mining claim before mentioned with the other mining ground owned by said Compromise Company; * * * that

the said Jerome B. Wheeler, or the Aspen Mining & Smelting Company, as his grantee, is entitled to, and the owner of, the one forty-second part of said Emma Mine and mining claim, * * * and the one forty-second part of the said stock realized from said Compromise Company as aforesaid by virtue of said consolidation of said portion of said Emma Mine and mining claims with mining grounds belonging to the said Compromise Company as aforesaid, and is also entitled to one forty-second part of the dividends paid them on said stock as aforesaid by virtue of the said Wheeler having purchased the one forty-second part or interest in said Emma Mine belonging to the said Maggie Cavner, one of the complainants in the said bill, and whose conveyance of her said interest to said Wheeler was held good and binding by the * * * United States circuit court of appeals." It was further ordered and adjudged, in substance, that the case be referred to Sanford C. Hinsdale, master in chancery, to take and state an account between the complainants and the defendants, pursuant to the aforesaid provisions of the decree, and to ascertain the amount of money due to the complainants on account of their ownership of an undivided ⅓ interest in and to said mining claim, less the 1/42 part thereof belonging to Maggie Cavner, which was adjudged to have been lawfully acquired by the defendants. Proceedings to state the account were begun before the master, pursuant to the provisions of the aforesaid decree, on February 2, 1893; but they were interrupted and suspended by an appeal taken on March 21, 1893, to the supreme court of the United States from an order made by the circuit court (53 Fed. 561) overruling certain objections to its jurisdiction. This appeal was subsequently dismissed (Smelting Co. v. Billings, 150 U. S. 31, 14 Sup. Ct. 4), whereupon, by an order made on June 18, 1894, the former master, Sanford C. Hinsdale, was directed to return into court the testimony theretofore taken by him, and the case was referred to Adolphus B. Capron, Esq., a master in chancery, to complete the taking of the testimony. By the same order the complainants below were given two days in which to take additional testimony; the defendants were required to complete their proofs by July 12, 1894; and the master was directed to file a final report of the evidence taken before him on July 14, 1894. The case was set down for hearing on July 19, 1894, and was heard on that day by the circuit court, upon the testimony taken and returned by the several masters.

As a result of such hearing the circuit court on August 22, 1894, rendered the following decree, in substance: First. That there was due and owing to the following heirs of William J. Wood, deceased, to wit, Margaret Billings (formerly the widow of William J. Wood, deceased), James O. Wood, Charles E. Wood, Thomas E. Wood, Hiram H. Wood, and William Wood (surviving sons of William J. Wood, deceased), on the 16th day of July, A. D. 1894, from Jerome B. Wheeler and the Aspen Mining & Smelting Company, for ores raised and sold by said defendants from the said Emma lode and mining claim, after deducting all necessary expenses and disbursements, and adding lawful interest, computed according to the laws of the state of Colorado, the sum of $434,008.58; said sum being the value of the ores, with lawful interest added, and all necessary expenses and disbursements deducted, which, under the terms of the decree entered on the 21st day of January, 1893, belonged to the above-named heirs of William J. Wood, deceased, which were sold by the said defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, and the proceeds thereof retained by said defendants, for which they are required to account to the said Margaret Billings, James O. Wood, Charles E. Wood, Thomas E. Wood, Hiram H. Wood, and William Wood. Second. That the said complainants were the owners of 304 shares of the capital stock of the Compromise Mining Company, the same being their proportion of the capital stock of the said Compromise Mining Company received by the defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, in consideration of a conveyance made by the Aspen Mining & Smelting Company to the said Compromise Company of 3.988 acres of surface ground of the said Emma lode mining claim,—said 304 shares of the capital stock of said Compromise Mining Company to be apportioned among the complainants according to their respective interests therein, as heirs of William J. Wood,

deceased, under the laws of the state of Colorado; that said defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company (or D. M. Van Hoevenbergh, trustee, if said shares of stock are held by him), shall forthwith assign and transfer said stock, upon the books of said Compromise Company, to the above-named heirs of William J. Wood, deceased; and that any and all unpaid dividends upon said shares of stock, now due or hereafter to become due, shall be paid to the above-named heirs of William J. Wood, deceased. Third. That there was due and owing to the complainants aforesaid on the 16th day of July, 1894, from Jerome B. Wheeler and the Aspen Mining & Smelting Company, for moneys realized by the said Compromise Mining Company, for ores raised and sold prior to the 1st day of January, 1893, with lawful interest added up to July 16, 1894, the sum of $104,984.05; said moneys having been by the said Compromise Mining Company paid to and retained by the said defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, and for which they are required to account to the said complainants. The decree further declared that inasmuch as the interest of Maggie Cavner had been acquired by the defendants, and that inasmuch as William G. Scott had withdrawn his application to be made a party complainant to the suit, the interest of both of said parties, as heirs of William J. Wood, deceased, amounting to $2/_{42}$, had been excluded from the accounting and the decree. After the terms of the decree had been announced, the defendants below petitioned the circuit court to reform and modify the aforesaid decree of January 21, 1893, by striking out so much thereof as adjudged that the complainants, as heirs of William J. Wood, deceased, were entitled to the value of one-third of the whole amount of the capital stock of the Compromise Mining Company, which the defendants Wheeler and the Aspen Mining & Smelting Company had received in consideration of the consolidation of a portion of the Emma Mine with other mines of the Compromise Mining Company. They also moved to expunge so much of said decree as adjudged that the complainants below were entitled to one-third of the dividends received by said defendants from the Compromise Mining Company in consequence of said consolidation. This motion was denied by the circuit court. The case comes to this court on an appeal taken and prosecuted by the defendants from the final decree which was entered on August 22, 1894.

Joel F. Vaile (Edward O. Wolcott and James M. Downing were with him on brief), for appellants.

T. A. Green, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first question to be considered has reference to the action of the circuit court in assuming to state the account itself, after an examination of the testimony which was taken and returned by the respective masters, instead of requiring the masters, or either of them, to report their individual conclusions upon the testimony so taken. It is contended in behalf of the appellants that such action on the part of the circuit court deprived them of the rights secured by equity rule 83, and that the decree should, for that reason alone, be reversed. With reference to such contention, it is only necessary to say that the action in question was doubtless at variance with the ordinary practice, but it affords no ground for reversing the decree, if it was for the right party and for the right amount. Notwithstanding the fact that it is ordinarily the duty of a master to file a written report containing his conclusions

upon questions of fact that may have been submitted to him, yet it is within the discretion of the chancellor to relieve the master of the duty of making such a report, if, for any reason, he thinks proper so to do. A chancellor has all the powers that can be exercised by a master, and if, in a given case, he sees fit to discharge a part of the functions that are ordinarily discharged by a master, the parties to the litigation have no just ground for complaint. In the present case the circuit court probably assumed, in view of the magnitude of the interests involved, that, if the master filed a report in the ordinary form, it would doubtless be compelled, on exceptions filed thereto, either by one or both of the parties, to examine and review all the testimony on which the master's findings were based. The action which the circuit court saw fit to take doubtless had the effect of speeding the cause, and neither party can be heard to complain in this court merely on account of the departure from the ordinary course of procedure; it being within the discretion of that court to state the account for itself, on an inspection and examination of the testimony, if it seemed expedient to undertake that labor.

It is next insisted by the appellants that those provisions of the decree of January 21, 1893, were and are erroneous, which required the defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, to account for the shares of stock and dividends derived by them from the Compromise Mining Company, and that that portion of the final decree of August 22, 1894, was likewise erroneous which adjudged that the complainants below were entitled to 304 shares of the capital stock of the Compromise Mining Company, and that they were further entitled to have and recover from the defendants $104,984.05 on account of ores taken by the Compromise Mining Company from the Emma Mine prior to January 1, 1893. These propositions necessitate a further statement of certain facts disclosed by the record, and, as the several contentions are closely related, for convenience they will be considered together. When the case was formerly before this court, we alluded to the fact that the Aspen Mining & Smelting Company had conveyed about four acres of the Emma mining location to the Compromise Mining Company, and that the latter company, which had not then, and has not since, been made a party to the suit, claimed to be the owner of that portion of said mine under conveyances executed by said Jerome B. Wheeler and by the Aspen Mining & Smelting Company. The former record, however, did not disclose any material facts relative to the organization of the Compromise Mining Company, further than the fact that there was such a company, and that it had acquired the title to a portion of the Emma mining claim. It now appears, as will be more fully shown by the annexed diagram, marked "Plat A," that there were in the same neighborhood a number of mining claims or locations belonging to different persons; among others, the Durant, the Emma, the Aspen, the Spar, the Connamara, and the Forrest.

Some time prior to the year 1887 the owner of the Durant Mine, which is represented on Plat A, laid claim to a large portion of the mineral-bearing ore found in the several mining locations which lay adjacent to the Durant claim on the west, among which were the

Emma, the Aspen, the Connamara, the Forrest, and one or two other claims' not shown by the plat. The claim so preferred by the owner of the Durant Mine was based on the ground that the lode which was found underneath the several adjacent mining

claims had its apex within the limits of the Durant location, and that the owner of that location was accordingly entitled, under section 2322 of the Revised Statutes of the United States, to follow the lode outside of the west side line of the Durant claim, and underneath the adjacent locations, provided he kept within the north and south end lines of the Durant location, extended westwardly. Considerable litigation was occasioned by this controversy between the owners of the several conflicting claims, which was finally settled in the year 1887 by the formation of what is known as the Compromise Mining Company. The testimony in the present record shows that the owner of the Durant claim conveyed to the Compromise Mining Company so much of his lode, if any, as lay outside of the west side line of the Durant claim extended downward vertically, and that the several adjacent mine owners conveyed to the same company so much of their respective locations as lay within the north and south end lines of the Durant location extended westwardly. In this way the consolidated mining company acquired a title from the Aspen Mining & Smelting Company to a portion of the Emma location embracing about four acres, being that portion of the Emma location, shown on Plat A, which lies south of the north end line of the Durant claim extended westwardly. The capital stock of the Compromise Mining Company appears to have consisted of 10,000 shares, one-half of which were apportioned and delivered to the owner of the Durant Mine. The residue of the stock appears to have been placed in the hands of a trustee for the benefit of the owners of the adjacent claims who had conveyed portions thereof to the Compromise Mining Company; the arrangement between them being that an account should be kept of the ore extracted by the Compromise Mining Company from the territory which they had respectively conveyed to that company, and that each grantor should receive the net proceeds of all ores taken from the ground that he had so conveyed to the Compromise Company, less one-half thereof, which was to be paid to the owner of the Durant claim. This arrangement was adopted by the adjacent mine owners in lieu of a division of the one-half of the capital stock of the Compromise Mining Company, which was held in trust for their benefit, because they were unable to agree upon the comparative value of their several contributions to the territory of the Compromise Mining Company. The 304 shares of the capital stock of the Compromise Mining Company, which, by the final decree of August 22, 1894, were adjudged to belong to the heirs of William J. Wood, deceased, and were ordered to be assigned to them on the books of the company, are a part of the capital stock of the Compromise Mining Company which was held under the arrangement heretofore explained, and had never been apportioned among the several mine owners for whose benefit it was originally placed in trust.

In view of the foregoing facts, we think that the point is well made, in behalf of the appellants, that the circuit court erred in attempting to subdivide and apportion the stock of the Compro-

mise Mining Company so held in trust as aforesaid, and in directing a transfer of 304 shares thereof to the heirs of William J. Wood, deceased. The persons for whose benefit the stock in question is so held have never been able to agree upon a division thereof among themselves, for the reason that they disagreed as to the value of their several contributions to the property of the company; and it goes without saying that the circuit court was powerless to make such a division, because a number of the persons interested in the apportionment had not been made parties to the suit, and could not be bound by any order in that behalf made. As the other beneficiaries in the trust, besides the present appellants, are not before the court, the utmost relief that can be afforded in the present suit is to require Jerome B. Wheeler and the Aspen Mining & Smelting Company to transfer and assign to the heirs of William J. Wood, deceased, $12/42$ of whatever interest the said Wheeler and the said Aspen Mining & Smelting Company now have in the Compromise Mining Company's stock, growing out of the conveyance of a portion of the Emma mining claim to that company. The transfer must be limited to $12/42$, because, for reasons already disclosed, only $12/42$ of the Wood interest is represented or involved in the present suit.

The point is made by the appellants that they should not be compelled to surrender $12/42$ of the interest in the Compromise Mining Company's stock, which they acquired in the manner aforesaid, and that they should not be compelled to account for the dividends, if any, which they have received from the Compromise Mining Company by virtue of their having acquired an interest in that company's stock. It is urged, in substance, that as the deeds and powers of attorney conveying the one-third interest of William J. Wood, deceased, in the Emma Mine, to Jerome B. Wheeler, have been canceled and annulled, the complainants below may hereafter proceed against the Compromise Mining Company for so much of the Emma mining location as has been conveyed to that company. It is further suggested that the complainants should be left to seek relief against that company for so much of the Emma Mine, and the ores taken therefrom, as it now claims to own under the conveyance made to it by the Aspen Mining & Smelting Company. We are not able, however, to assent to that view of the case. The complainants below have not appealed from the final decree, which gave them an interest in the Compromise Mining Company's stock, and required the defendants, Wheeler and the Aspen Mining & Smelting Company, to account for the dividends received thereon from the Compromise Mining Company. By not appealing from that portion of the decree, they have elected to receive and accept from the said defendants their due proportion of the consideration which was paid for the conveyance of a portion of the Emma Mine to the Compromise Mining Company. Such action on the part of the heirs of William J. Wood, deceased, who are parties to this suit, amounts to a ratification of the conveyance made by the Aspen

Mining & Smelting Company to the Compromise Mining Company of a portion of the Emma Mine, and they cannot hereafter maintain a suit against the latter company to recover that portion of the Emma Mine which it now holds. The Compromise Mining Company, we think, can plead the aforesaid action on the part of the complainants below as a bar to any future suit which they may see fit to bring against the Compromise Mining Company to recover that portion of the Emma Mine which it now holds, notwithstanding the fact that it has not been made a party to the present bill. A person cannot accept or recover from a fraudulent grantee of property the consideration which he has received for the sale of the property to a third party, and thereafter maintain an action against such third party for a recovery of the property itself. We are also of opinion that the averments of the bill of complaint, and the mandate of this court on the former hearing, are sufficient to justify the entry of a decree against the defendants below, such as is above indicated; compelling them to transfer a portion of their interest in the stock of the Compromise Mining Company, and also compelling them to account for a proper proportion of the dividends, if any, which they have heretofore received, that were derived from that interest. We think that the objections to such a decree, based on the character of the bill and the form of the mandate, are without adequate foundation, and are therefore untenable. Moreover, this litigation has now extended over many years, and has proven to be expensive to the litigants and burdensome to the courts. This fact furnishes an additional reason why the court should, if possible, so mold its decree as to terminate the controversy, instead of opening the door to additional litigation by requiring the complainants to seek further relief against the Compromise Mining Company.

It remains to be further decided, on this branch of the case, whether the circuit court erred in awarding to the complainants the sum of $104,984.05 as their just proportion of the moneys received by Jerome B. Wheeler and the Aspen Mining & Smelting Company from the Compromise Mining Company, on account of ore extracted by it from that portion of the Emma Mine which was conveyed to the Compromise Mining Company. We are of the opinion, as heretofore stated, that the complainants are entitled to recover from the appellants $12/42$ of whatever dividends were paid to them by the Compromise Mining Company on account of ores taken from the Emma Mine; but the important question to be determined is whether the evidence introduced on the hearing before the masters warranted a finding against the appellants in the sum of $104,984.05, or in any other amount, on account of dividends thus received. This is an issue of fact to be determined in the light of all the evidence, and it is only necessary to state the conclusion that has been reached after an attentive reading of the testimony.

Large sums of money, by way of dividends, were doubtless paid to Jerome B. Wheeler, from time to time, after the formation of

the Compromise Mining Company, on account of an interest which he owned in the stock of that company; but as Wheeler was the owner of a large interest in the Aspen, Connamara, and the Forrest mining locations, which had contributed a large portion of their territory to the formation of the Compromise Mining Company, as will appear from Plat A, the fact that he received such dividends is no evidence that the Compromise Mining Company extracted ore from that portion of the Emma Mine which was conveyed to the Compromise Mining Company, or that it realized any profit from working that mine. The books of the Compromise Mining Company, as well as the testimony of the president of that company, show that no money was made out of mining operations that were carried on within the territory of the Compromise Mining Company which was covered by the Emma location. They further show that no dividends were paid, either to Wheeler or to the Aspen Mining & Smelting Company, on that account. We see no reason to distrust the accuracy of the books that were produced by the Compromise Mining Company. They appear to have been regularly kept, and bear no evidence of alterations. These books also show that the territory covered by the Aspen and Forrest claims yielded most of the valuable ore that was mined by the Compromise Mining Company, while other testimony tends to show that that portion of the Emma Mine lying south of the north end line of the Durant claim extended westwardly, had been extensively worked before the organization of the Compromise Mining Company, and that it had been, to a large extent, denuded of its valuable ores. In short, the proof contained in the present record is plenary—and there is little or no evidence to the contrary—that the-appellants have not received any dividends from the Compromise Mining Company on account of mineral extracted from the Emma claim. Without going further into details of the evidence, it will suffice to say that we are satisfied that the circuit court erred in charging the appellants with the sum of $104,984.05 on that account, and the charge so made must be expunged from the decree.

At this point it becomes necessary to notice a defense interposed on the last hearing before the circuit court, by which the defendants below sought to evade all liability to account to the heirs of William J. Wood, deceased, for any ore extracted by them from the Emma Mine, except such as may have been taken from that small triangular portion of the claim which lies between the south end line of the Spar claim and the north end line of the Durant claim, both lines extended westwardly. See Plat A. Jerome B. Wheeler, as it seems, is the owner of the Spar claim indicated on Plat A, lying to the east of the south end of the Emma location. The contention is, in substance, that the lode on which the Emma claim was originally laid, and from which all the ore mined underneath the surface of that claim has been taken, has its apex in the Spar and Durant claims, which lie east of the Emma, and on higher ground. It is insisted, therefore, that inasmuch as Wheeler and the owner of the Durant claim hold the

apex of the lode which underlies the Emma claim, they, or their successors in interest, are entitled to all the ore that has heretofore been taken from underneath the Emma location, with the exception above stated, and that the Wood heirs have no title thereto, or right to recover any part of the value thereof. This defense was not pleaded by the defendants below in their answer to the bill of complaint, but was raised for the first time on the hearing before the master, more than one year after the order of reference had been made, by the introduction of certain expert testimony, all of which was objected to at the time, which had some tendency, perhaps, to show that the apex of the Emma lode was found in the Spar and Durant claims. Moreover, when the interlocutory decree of January 21, 1893, was signed, which expressly adjudged that the Wood heirs were entitled to one-third of the net proceeds of the Emma Mine, and further required the defendants to account therefor from the time said mine and mining claim became productive, no exception was taken thereto, nor was the court asked to so frame the interlocutory decree as to permit the master to hear testimony and to make a report concerning the apex contention, which is now deemed of such importance as to deprive the complainants below of the fruits of the litigation, to wit, of all right to participate in the profits derived from working the Emma Mine. In what we have thus said, we would not be understood as deciding that the appellants were and are barred of their right to make the apex defense because it was not pleaded in their answer to the bill. We express no decisive opinion on that question, but we allude to the facts above stated, and to the conduct of the defendants in holding a defense of such supreme importance in reserve until such a late stage of the litigation, as a good and sufficient reason why the trial court, and this court as well, should view the defense with disfavor, and require it to be established, if it is considered at all, by testimony of the most satisfactory and convincing character. The burden of establishing the defense in question is certainly upon the appellants, and, in view of the circumstances which tend to discredit it, the defense should be made out by proof which leaves little or no room for doubt that all the ores taken from underneath the surface of the Emma location were taken from a lode which in fact belonged to the owners of the Spar and Durant claims. The record now before us contains abundant evidence that the apex question, which was injected into the case on the hearing before the master, is not a new, nor by any means a settled, question in the locality where the several mining claims heretofore mentioned are situated. It is evident that it always has been, and still is, a debatable question, which has given rise to much speculation and to different theories. It has also occasioned considerable litigation among mine owners, and has developed a marked difference of opinion among practical miners and mining experts. The Compromise Mining Company, as heretofore shown, owes its origin and its present existence to the same apex controversy. The sev-

eral mine owners whose interests were vitally affected thereby evidently found it difficult, if not impossible, even by a great outlay of time and money, to settle the dispute before a jury, probably because an equal number of persons of equal skill and experience in the determination of such questions differed so widely in their views, and were able to give equally satisfactory reasons in support of their respective theories. They accordingly organized the Compromise Mining Company, in the manner heretofore explained, to avoid further controversy. On the hearing before the master, two witnesses were produced by the appellants, and examined at some length, with a view of showing that the apex of the Emma lode is found within the Spar and Durant locations. The complainants below offered no evidence in rebuttal; claiming, as they did, that the question was not submitted to the master, and that the evidence was therefore irrelevant. The testimony of these witnesses, as is usual in such cases, consists, in a great measure, of opinions and theories formed on an examination of the several mines, and an inspection of the physical characteristics of the surrounding country. One of the witnesses was an employé of the Aspen Mining & Smelting Company, and for that reason was most likely affected by a natural desire to be loyal to its interests. It is fair to presume that both witnesses have expressed opinions as highly favorable to the appellants as the circumstances of the case would warrant, and that neither of them was watchful to observe, or overcareful to state, such facts as would tend to overthrow the theory and to discredit the defense which the appellants sought to maintain. In view of the foregoing considerations, we have reached the conclusion that we would not be justified in finding, on the evidence contained in the present record, that the lode on which the Emma location was laid in fact belongs to the owners of the Durant and Spar claims, even if we felt satisfied that the issue was properly raised in the circuit court, and that it is properly before us for determination. The issue in question, upon the evidence now before us, is involved in too much doubt and uncertainty to justify a decision in favor of the appellants The fact may be as contended by them, but it has not been proven with that degree of certainty which would warrant us in making a finding in accordance with their contention.

The next question for consideration is whether the circuit court erred in awarding to the complainants below the sum of $434,-008.58 as their just proportion of the value of all ores extracted from the Emma Mine by Jerome B. Wheeler and by his grantee, the Aspen Mining & Smelting Company. The record shows that the gross sum last mentioned contains an allowance for interest on the value of ores mined and sold, computed up to July 16, 1894, and that it is made up of two items, to wit, the sum of $195,252.97, which was the amount allowed, together with interest, on account of ores mined and sold by Jerome B. Wheeler prior to January 1, 1886, which is hereafter termed the "Wheeler Period," and the sum of $238,755.61, which was the sum allowed for

ores raised and sold by the Aspen Mining & Smelting Company subsequent to its organization, and after its purchase of the Emma Mine, in December, 1885, which is hereafter termed the "Smelting Company Period." It is contended by the appellants that both of these allowances were and are excessive. This contention raises an issue of fact that has necessitated a careful examination of all the testimony contained in a voluminous record, including numerous statements of account and exhibits. We shall only undertake to state the conclusion that has been reached after such an examination of the testimony, the accounts, and the exhibits.

In a petition for a rehearing that was filed by the appellants after the announcement of the terms of the decree, the appellants conceded that the gross receipts from the Emma Mine, including interest allowances, during the smelting company period, amounted to $1,803,668.64. They further admitted that the total disbursements for necessary mining expenses during the same period did not exceed $1,071,017.32, leaving the sum of $732,651.32 as the net balance for distribution among the several owners of the Emma Mine, of which latter sum it was conceded that the complainants below, representing $12/4?$ of the interest of William J. Wood, deceased, were entitled to $209,328.95. The amount apportioned to the complainants by the circuit court, including interest, on account of their share of the proceeds of the mine during the same period, was, as above stated, $238,755.61. After a patient investigation of the testimony and the accounts, we have concluded that the evidence contained in the record is insufficient to warrant an allowance against the appellants on account of ores mined and sold during the smelting company period in excess of $209,328.95, and that sum has accordingly been fixed as the correct amount of the allowance. It does not give credit to the appellants for what are termed "general expenses" of the Aspen Mining & Smelting Company, or "litigation expenses," because the evidence before us is insufficient to enable us to determine with any degree of accuracy what portion of such expenses ought to be apportioned to and charged against the Emma Mine, as distinguished from the numerous other mines belonging to the Aspen Mining & Smelting Company, on account of which such expenses were incurred. . The appellants having failed to furnish any satisfactory evidence as to these alleged outlays, or to make any apportionment thereof on the books of the Aspen Mining & Smelting Company when the money was expended, they were, as we think, properly disallowed as credits in the accounting.

Greater difficulty has been experienced in determining the amount that ought to be awarded to the complainants below on account of the product of the Emma Mine during what is termed the "Wheeler Period." The mine, as it seems, became productive some time during the year 1884, but at what precise date is not shown with certainty; and it was thereafter worked by Wheeler until about January 1, 1886, when it was conveyed by him to the Aspen Mining & Smelting Company. The circuit court awarded to the complainants, including

interest, the sum of $195,252.97, on account of ores mined and sold during that period, whereas, in the petition for a rehearing heretofore mentioned, the appellants insisted that they were only entitled to recover the sum of $95,915.02. In other words, the allowance for this period is claimed to be excessive in the sum of $99,337.95. The computation made in behalf of the appellants to show the result aforesaid is based upon the assumption that the total receipts from the Emma Mine during the Wheeler period amounted only to the sum of $348,-412.64, not including interest, whereas the complainants below contended, and the circuit court evidently found, that the total output during the period in question was a much larger amount. With reference to this controversy, it will suffice to say that we have become satisfied by an examination of the testimony that the sources from which the information relative to the early yield of the mine was compiled by the appellants are not reliable. No regular account appears to have been kept of the yield of the mine during the Wheeler period, or, at least, no such account was produced by the appellants at the hearing before the masters. Such information relative to the output of the mine as was obtained from books of account appears to have consisted of stray entries found in a journal, cash book, and ledger of the firm of J. B. Wheeler & Co., and of some entries found in the books of the Aspen Smelting Company, which was a corporation other and different from the Aspen Mining & Smelting Company. During the Wheeler period, according to the testimony of James H. Devereux, one of his confidential employés, one or two suits were brought against the defendant Wheeler by persons who claimed to have an interest in the Emma Mine, and other suits of a similar character were threatened. A controversy appears to have existed during most of the Wheeler period as to the persons who were entitled to an interest in the mine, and as to the extent of their several interests. Under these circumstances, and inasmuch as the defendant Wheeler was in possession of the property, and was extracting large quantities of valuable ore therefrom, and would very likely be called upon to account for some portion of the proceeds of the mine, it is a little remarkable, we think, that an authentic account of the amount of ore extracted from the mine was not kept, and that the same was not produced on the hearing before the masters and before the circuit court. In the opinion rendered by this court on the former hearing of the case (Billings v. Smelting Co., 10 U. S. App. 1, 60, 2 C. C. A. 252, 51 Fed. 338) we alluded to the fact that the testimony of James H. Devereux showed that within a period of five or six months preceding the month of April, 1885, the Emma Mine had yielded $300,000, and that, from indications given by ore then in sight, it would certainly produce as much more. The same witness further testified, in substance, in the course of the same examination as a witness for the present appellants, that the largest net output of the Emma Mine within any one month was about $150,000. This latter statement, as we understand, must relate to the Wheeler period, inasmuch as the books of the Aspen Mining & Smelting Company fail to show that it produced that amount during any one month of the smelting company period. An-

other witness, A. W. Rucker, who owned a $1/24$ interest in the Emma Mine, also testified that prior to April, 1885, the Emma Mine had yielded as much as half a million dollars, and that his estimate was based on the share of the proceeds of the mine which he had himself received. This testimony was properly before the circuit court for consideration on the last hearing of the case. In view of these considerations, we do not feel at liberty to disturb the finding of the circuit court relative to the output of the Emma Mine during what is known as the "Wheeler Period." The finding in question is not without good reasons to support it, and, in any event, it is entitled to the presumption which always attends the finding of a chancellor on an issue of fact,—that a correct conclusion has been reached,—unless it appears that an obvious error has intervened in the application of the law, or that some serious and important mistake has been made in the consideration of the evidence. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894; Warren v. Burt, 12 U. S. App. 591, 600, 7 C. C. A. 105, 58 Fed. 101; Latta v. Granger, 15 C. C. A. 228, 68 Fed. 69, 72. It might possibly be suggested that because of the great discrepancy between the amount found to be due, and the sum claimed by the appellants to have been realized during the Wheeler period, the case is one which would justify a re-reference, and an additional investigation before a master relative to the output of the mine during the period in question. But the answer to this suggestion is that, if the appellants have other and better evidence of the gross yield of the mine than is found in the present record, they should have produced it on the hearing before the master, as it was their duty to do. If they have no such additional proof, nothing is to be gained by a re-reference. In a case like the one at bar, where a defendant has been required to account for money and property wrongfully appropriated and retained, a court of equity will not grant him the privilege of a rehearing on account of the weakness of the case made by his adversary, if there is any data to establish the amount of his liability, where it seems probable that he has withheld any information that it was within his power, by proper diligence to have produced. The decree of January 21, 1893, establishing the liability of the appellants, and directing them to account, made it their duty to be active and diligent in discovering and in producing reliable proof before the master, which would show, with reasonable certainty, the gross output of the mine from the time it became productive, and the necessary expenses that had been incurred in working it. There is another reason as well why a re-reference of the case should not be ordered. The suit has now been pending in the courts for nearly eight years. It has already occasioned three appeals, and from time to time has given rise to acrimonious controversies. It is high time, therefore, that the litigation was terminated.

One further question remains to be noticed and decided. The circuit court rendered a decree against Jerome B. Wheeler and the Aspen Mining & Smelting Company, jointly, for $12/42$ of the value of the ores taken from the Emma Mine during the Wheeler period, and also during the smelting company period. Such action on its

part is claimed to have been erroneous. The point thus raised is well taken, we think, with respect to ores mined during the Wheeler period. No reason has been assigned, and none, we think, can be given, why the Aspen Mining & Smelting Company should be held responsible for the value of ores appropriated by its codefendant, Wheeler, before the smelting company was organized and had acquired an interest in the property. But the case is different with respect to ores mined and sold during the smelting company period. Wheeler was the president of the Aspen Mining & Smelting Company, and its largest stockholder. He was a fraudulent grantee of the Wood interest in the Emma mining claim. He conveyed that interest in the claim, as well as his own, to the smelting company, that the claim might be worked to better advantage, and with the expectation that it would be worked and denuded of its valuable ores, and in the end rendered valueless. It was so worked for a number of years by his direction, and under his supervision, and, as a stockholder, he received, personally, a very large proportion of the total output of the mine. Under these circumstances, and for these reasons, we have concluded that he was a wrongdoer during the smelting company period, and that he cannot be permitted to shield himself from liability, behind the corporation of which he was president, for ores extracted during the smelting company period, and thereby compel the complainants to resort to the Aspen Mining & Smelting Company alone, which may or may not be financially able to answer for the wrongs committed. We think, therefore, that the circuit court acted properly in holding the defendant Wheeler to be jointly liable with the Aspen Mining & Smelting Company for $^{12}/_{42}$ of the net value of the ores that were taken from the mine during the smelting company period.

For the reasons heretofore fully indicated, the final decree rendered by the circuit court on August 22, 1894, should be modified as follows: First. The sum of $434,008.58, specified in the first paragraph of said decree, should be expunged therefrom, and in lieu thereof the sum of $404,581.92 should be inserted. Second. The entire second and third paragraphs of said decree should be stricken out and expunged therefrom, and in lieu thereof the circuit court should adjudge, determine, and decree that the complainants, Margaret Billings, James O. Wood, Charles E. Wood, Thomas E. Wood, Hiram H. Wood, and William Wood are justly entitled to $^{12}/_{42}$ of whatever interest the said Jerome B. Wheeler and the Aspen Mining & Smelting Company have, or have heretofore had, in the stock of the Compromise Mining Company, growing out of the conveyance of a part of the Emma mining claim to the said Compromise Mining Company; that within 20 days from the entry of the modified decree the said Jerome B. Wheeler and the said Aspen Mining & Smelting Company do cause to be executed, and filed with the clerk of the circuit court of the United States for the district of Colorado, a good and sufficient conveyance or assignment to the said complainants of an undivided $^{12}/_{42}$ of the aforesaid interest in the stock of the Compromise Mining Company so held and acquired by them as aforesaid; that thereupon the said

complainants succeed to and stand subrogated to all the rights, of whatsoever nature or character, that were theretofore enjoyed, held, or exercised by the said Jerome B. Wheeler and the said Aspen Mining & Smelting Company in consequence of their ownership of the aforesaid interest in the stock of the Compromise Mining Company that shall be so conveyed and assigned; and that the said Jerome B. Wheeler and the said Aspen Mining & Smelting Company be forever enjoined and restrained from asserting, as against the complainants or the Compromise Mining Company, or any other person or persons, any right, title or claim whatsoever to the interest in the stock that shall be so conveyed, or to any dividends, rights, benefits, or privileges that may be incident thereto. Third. The last clause of the sixth paragraph of the decree, beginning with the words, "It is further ordered, adjudged, and decreed," should be stricken out, and in lieu thereof the circuit court should order, adjudge, and decree that the defendant Jerome B. Wheeler, within 30 days after the modification of the decree, shall pay, or cause to be paid, unto the complainants above named, the sum of $195,252.97, with interest computed thereon at the rate of 8 per cent. per annum from July 16, 1894, until such payment is made, and that the defendants, Jerome B. Wheeler and the Aspen Mining & Smelting Company, do pay or cause to be paid to said complainants the further sum of $209,328.95, with interest computed at the same rate as aforesaid, from July 16, 1894, until said payment is made, together with all costs incurred in the circuit court, and that, in default of making such payments within the time limited, executions for the several amounts aforesaid be issued in the ordinary form. The costs of the present appeal will be divided equally between the appellants and the appellees. The case is remanded to the circuit court, with directions to cause its decree of August 22, 1894, to be modified in the respects heretofore indicated.