PEPPER v. ADDICKS.

(Circuit Court, E. D. Pennsylvania. May 17, 1907.)

No. 41.

1. CORPORATIONS—OFFICERS—MISAPPROPRIATION OF FUNDS.

Where defendant, an officer and director of a corporation, absolutely dominated its board of directors and induced such board to authorize the purchase of worthless bonds of other corporations in which he was interested, by which he was enabled to make a large individual profit, he was liable to account to the corporation's receiver for the profit so made.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 1393–1415.]

2. EQUITY—ACCOUNTING—APPOINTMENT OF MASTER—DISCRETION.

In a suit by the receiver of a corporation for an accounting of profits wrongfully made by defendant, an officer and director, by the wrongful use of the corporation's funds, the court, after determining defendant's liability, was not bound to appoint a master to take an account, but could do so or not, in its discretion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 866.]

W. B. Bodine, Jr., and F. B. Bracken, for complainant
Herbert H. Ward and George L. Crawford, for defendant.

J. B. McPHERSON, District Judge. This bill in equity is brought by the receiver of the Bay State Gas Company, a corporation organized under the laws of the state of Delaware, against John Edward Addicks, to compel him to pay over certain profits which he is alleged to have made improperly by using the corporation assets for his individual purposes. The bill, as originally filed, sought to recover profits made in five groups of transactions that were averred to be illegal, but upon final hearing the complainant confined himself to the one group that is about to be described. From the admissions contained in the pleadings and in the briefs of counsel, and from the evidence laid before the court, I find the facts to be as follows:

(1) On April 24, 1889, the defendant caused to be chartered under the laws of the state of Delaware a corporation named the Peninsular Investment Company; this name being afterwards changed to the Bay State Gas Company (hereinafter called the Delaware Com-

pany). The authorized capital was originally $100,000—the shares being $50 each—which was subsequently increased to $1,000,000,000. Of this amount, shares aggregating a par value of $250,000,000 were issued from time to time, purporting to be full paid and nonassessable. How much cash was paid for these shares does not appear in the evidence. The charter authorized the company to begin business after 100 shares had been subscribed and $2,500 had been paid thereon. From its organization to December 4, 1901, except during the period from November 25, 1896, to September 24, 1897—when he was vice president and a director—the defendant was continuously the president, and also a director, of the corporation.

(2) On February 15, 1893, Henry D. Kirkover, Philo D. Beard, and Henry Altman organized the Queen City Gaslight Company (hereinafter called the Gas Company)—with a capital stock of $50,-000, being 500 shares at a par value of $100—for the purpose of manufacturing and distributing artificial gas in Buffalo, N. Y. They laid a few pipes to hold their franchises, but for several years did no business and had no plant. As will hereafter appear, the plant was not built and ready for operation until the end of the year 1897.

(3) Meanwhile it became necessary to look about for capital, and to devise some scheme out of which the promoters might hope to reap a profit; and accordingly, as the first step in this direction, Kirkover and Beard, having acquired Altman's interest, agreed with the defendant to transfer the stock of the Gas Company to a construction company to be formed by him to construct a plant for the Gas Company; and in return for this transfer they were to receive a one-fifth interest in the construction company. At or about this time E. Stein—who had brought the defendant and Beard and Kirkover together—and Silas W. Pettit became associated in the enterprise.

(4) The defendant, on December 27, 1894, or thereabouts, caused the Queen City Construction Company (hereinafter called the Construction Company) to be formed as a limited partnership under the laws of Pennsylvania, with a capital stock of $300,000; the stock having a par value of $100. One share was issued to him for $100 in cash, one share to E. Stein for $100 in cash, and 2,998 full-paid shares, of the par value of $299,800, to W. Harry Miller for 450 shares of the stock of the Gas Company, leaving 50 shares of the Gas Company in the hands of Kirkover and Beard. The managers of the Construction Company were the defendant, Stein, and Miller; the defendant being chairman, and Miller being secretary and treasurer. Miller never had any real financial interest in the company, but merely allowed the defendant to use his name. He was the secretary of the Delaware Company from March, 1890, to December, 1896; its treasurer from November, 1895, to the time when the receiver was appointed; and a director from February, 1895, to November, 1895, and afterwards from October, 1900, to the date of the receivership.

(5) In accordance with the agreement concerning the distribution of the Construction Company's stock, Miller transferred 600 shares, or one-fifth of the total number, to Silas W. Pettit on December 27, 1894. On the same day, or soon afterwards, Pettit transferred 150 shares to Kirkover, 150 shares to Beard, and 250 shares to Lewis M.

Mintess, a clerk in the interest of the persons whom Pettit represented, namely, Pettit himself and Stein. When Kirkover and Beard received their shares in the Construction Company, they transferred the remaining 50 shares of the Gas Company's stock to the Construction Company, thus making the Construction Company the sole owner of the Gas Company's stock and making their interests identical. The corporate organizations continued to be separately maintained, but this was a mere formality, the Gas Company being absolutely owned by the Construction Company, and the Construction Company being completely owned and controlled by the defendant.

(6) There was some agreement, probably in 1896, before the month of July—but the date and details of it are not clearly proved, the written contract having apparently been lost—that the Construction Company should build a small plant for the Gas Company, in order to comply with the requirement of the latter company's franchise; and perhaps, also, that a larger plant should be afterwards built. For one or both of these reasons it was necessary to raise money, and, as neither the Gas Company nor the Construction Company had more than a small sum, if any sum at all, in its treasury, the defendant in the year 1896, from July or August to December, caused the Delaware Company, at various times, to lend the Construction Company, at 4 per cent., without security, sums of money aggregating $110,000. Out of this money the Construction Company built a small plant for the Gas Company, which was finished about December 1, 1897. As hereinafter stated, this loan of $110,000 was afterwards fully repaid to the Delaware Company by the Construction Company. Some other money was probably borrowed elsewhere by the Construction Company for the same purposes, but the amount does not satisfactorily appear. It is safe to say, I think, that at the most no more than $180,000 was ever invested in the Gas Company's affairs.

(7) Between September 11, 1897, and November 15, 1897, the defendant caused the Delaware Company to agree to buy at par from the Gas Company $1,000,000 of its 5 per cent. bonds, to be afterwards issued. On September 11, 1897, the purchase of $250,000 of these bonds was authorized, and on September 13, 1897, the Delaware Company drew a check for $250,000 in favor of Beard, who was then the treasurer of the Gas Company. He indorsed the check, and at the defendant's request it was deposited by Miller, the treasurer of the Construction Company, in the bank account of the latter company. On September 18th the purchase of another $250,000 of these bonds was authorized, and on the same day three checks, aggregating $250,000, were drawn by the Delaware Company to Beard's order, as treasurer of the Gas Company, which were indorsed by him and deposited by the defendant in the bank account of the Construction Company. On November 15th the purchase of $500,000 more of these bonds was authorized, and on the same day the Delaware Company drew a draft in favor of Beard, as treasurer of the Gas Company, on Brown, Riley & Co., who were brokers in Boston, and as such brokers had sold large quantities of the Delaware Company's stock, and had in their hands that amount of money belonging to the Delaware Company. Upon receipt

of this draft, Brown, Riley & Co., with whom the Construction Company also.had opened an account, credited the Construction Company with $500,000, and charged the Delaware Company's account with that sum. None of this $1,000,000 ever went into the treasury of the Gas Company, even in form, or was used for its corporate purposes.

(8) In return for this $1,000,000 in cash that found its way into the Construction Company's treasury, the Delaware Company got an order from the Gas Company on the Central Trust Company of New York for the bonds, whenever they should be issued. The Gas Company never executed any mortgage, however, or issued any bonds. It did a little business, but never paid operating expenses, and it had very little of value to offer as security for an incumbrance of $1,000,000. No one would have taken the bonds, except as a venturesome speculation, or as part of a scheme which contemplated further steps before success should be attained. The purchase of $1,000,000 of such bonds at par, standing by itself, would be an act either reckless in the extreme, or suggesting combination for some purpose between the buyer and the seller. The Gas Company never paid any interest to the Delaware Company on the $1,000,000 paid as above stated. The defendant's explanation of the Gas Company's failure to issue its bonds is to be found in the transactions with the People's Gaslight & Coke Company, which will be immediately set forth. It should be added here, however, that some preliminary steps towards issuing the bonds, such as consultation with counsel, were taken, and I have no doubt that the bonds would have been actually issued if the People's Company had not come upon the scene at this juncture.

(9) On November 2, 1897, Messrs. Herbert P. Bissell, Wm. C. Cornwell, Jno. A. Kennedy, P. H. Griffin, Frank B. Beard, Fred C. M. Lautz, H. S. Denney, and T. Guilford Smith incorporated the People's Gaslight & Coke Company of Buffalo (hereinafter called the People's Company) with an authorized capital stock of $3,000,000, of which very little appears to have been paid in. These gentlemen, as an unincorporated syndicate, had for some weeks been engaged in negotiations with the defendant and his Construction Company, which culminated in an agreement, dated October 12, 1897, hereinafter to be set out in full.

(10) On December 3, 1897, the defendant caused the Construction Company to enter into four contracts with the Gas Company, with the People's Company, and with its incorporators as a syndicate (carrying out the antecedent agreement of October 12th) the effect of which was, inter alia, that the Construction Company should sell to the People's Company all the stock of the Gas Company for $100,000 in cash and $1,398,000 at par of the bonds and $218,000 at par of the stock of the People's Company. Of these bonds, the first four years' coupons upon $1,218,000 were to be detached and retained by the treasurer of the People's Company.

(11) On December 7, 1897, the defendant caused the directors of the Delaware Company to pass a resolution agreeing to accept, in substitution for the $1,000,000 5 per cent. bonds of the Gas Company, which had been paid for by the Delaware Company, but had never been issued, $1,200,000 in the 5 per cent. bonds of the People's Com-

pany at par, with the first four years' coupons removed; this being equivalent to $1,000,000 with interest in advance for four years.

(12) The Construction Company thereupon received an order drawn by the People's Company on the Colonial Trust Company of New York for the bonds that the People's Company owed to the Construction Company under the agreements of December 3, 1897, and assigned $1,212,000 of this order to the defendant; the balance, $186,000, having previously been issued.

(13) By these transactions the Construction Company had made a net profit of $920,000 in cash, and was to receive, also, $218,000 of stock in the People's Company and $86,000 of its bonds. It had received in cash $1,000,000 from the Delaware Company and $100,000 from the People's Company syndicate, and an order for $86,000 of the bonds of the People's Company, over and above the bonds that had been assigned to the Delaware Company; and it was also entitled to receive from the syndicate $218,000 of stock in the People's Company. For all purposes connected with the Gas Company it had spent not much more than $180,000.

(14) In the latter part of 1897, the minority interests in the Construction Company were bought out, either by the defendant or by the company itself, at a cost of $29,727.10 in cash, $85,000 of People's Company bonds, and $20,000 of People's Company stock. In September the Pettit, Stein, and Mintess shares were bought for $10,000. In December 50 of Beard's shares and the 150 shares belonging to Kirkover were acquired for $15,000 in cash, $85,000 of People's Company bonds, and $20,000 of People's Company stock. A few days later the remaining 100 shares belonging to Beard were acquired from his pledgees for $4,727.10.

The defendant has always been the chairman, and as the majority stockholder has always controlled the acts, of the Construction Company, although for several years a few other persons were real, and not merely nominal, owners of stock therein. All of this minority stock was acquired at or about the time when the stock and franchises of the Gas Company were sold to the People's Company, so that he was then, in effect, both the Gas Company and the Construction Company under these different names, being the absolute owners of their capital stocks. The small plant which the Construction Company built for the Gas Company was the only work of the kind that it ever did. Its office, and the offices of the Delaware Company and of the defendant, were occupied in common.

(15) In these transactions the defendant's individual net profit was about $890,000 in cash. The Construction Company's profit was $920,000, and, as the defendant had become the sole owner of the Construction Company at a cost of $29,727.10 in cash, all the assets of the company were really his, although they may have borne the corporate label.

(16) The money received by the Construction Company from the Delaware Company was used almost entirely for the purpose of dealing in securities for the defendant's individual benefit, although his individual name was not used. The first $250,000 was paid on September 13, 1897. On September 14th $100,000 was sent to Brown, Riley & Co.

On September 18th the second $250,000 was paid. On September 24th $230,000 was sent to Brown, Riley & Co. The last $500,000 went to these brokers direct. The first $330,000 was applied by Brown, Riley & Co. to the purchase in the name of the Construction Company of the Delaware Company's income bonds at prices averaging about 62 per cent. The defendant afterwards caused the Delaware Company to repurchase these bonds at 80 per cent. The last $500,000 was applied by Brown, Riley & Co. to a copper stock account, which was also carried in the name of the Construction Company, and upon this transaction a profit was realized.

(17) On January 17, 1898, a contract was entered into between the Gas Company and the People's Company, whereby it was provided that the Gas Company should build a plant for the People's Company for $842,000 of the bonds of the People's Company and $1,060,000 of its stock. On May 7, 1898, the Gas Company assigned the burdens and benefits of this contract to the Buffalo Contracting Company. On September 12, 1898, the Buffalo Contracting Company and the People's Company entered into a modified agreement, whereby it was provided that the People's Company should deliver to the Buffalo Contracting Company $645,000 of bonds and $1,816,200 of stock for the same construction, and this agreement was carried out.

(18) The bonds of the People's Company were intrinsically worth comparatively little. The total issue was $2,100,000, and the only money ever received by the company came from the sale of these bonds; the stock having been issued for nothing of value. Its plant cost about $500,000. Its gross earnings from April 30, 1898, to February 13, 1899, the only period during which it was operated, were $4,223.36. The only security for the bonds were the plant and franchises of the People's Company and of the Gas Company. These were the only assets that the People's Company ever had. Its bonds were almost without real value—although a speculative price was obtained for some of them—and no interest was ever paid on any of them. The plant, franchises, and property of the People's Company, including the property of the Gas Company, were afterwards acquired by the Buffalo City Gas Company—an older company, in possession of the field—in order to get rid of an annoying competitor. This disposition of the property of the Gas Company and of the People's Company was probably the ultimate object of the various promoters from the beginning, with such incidental profit as they might be able to pick up by the way.

The facts thus far stated are in the main either undisputed or indisputable, but there is a controversy over the important transactions outlined in paragraphs 10, 11, 12, 13, 14, 15, and 16, and it is therefore desirable to go into these matters somewhat more fully.

On October 12, 1897, the syndicate, that incorporated the People's Company shortly afterwards, made the following proposition to the Construction Company, which was accepted on the same day:

"October 12, 1897.

"Queen City Construction Company, Limited—Gentlemen:

"The undersigned syndicate, representing themselves and others, hereby make the following proposition for the purchase of all the stock, rights, franchises and property of the Queen City Gaslight Company:

"They offer to pay the sum of $100,000 in cash, and $80,000 in the bonds of the company, which said sum of $180,000 is the purchase price of the plant as fixed by you.

"They further offer to pay the sum of $1,000,000 in the bonds of the company for the legal rights and franchises belonging to the company. This offer is based on a proposition to issue two millions of bonds and two millions of capital stock.

"We are to increase the board of directors of the company and take such other action as we may be advised regarding the formation of the company, substituting ourselves or our representatives as a board of directors and managing the affairs of the company. One hundred thousand dollars of bonds are to be paid to us as a syndicate for the $100,000 of cash furnished as above set forth. The balance of the bonds are to be held in the treasury for the purpose of constructing and operating the plant and paying fixed charges as may be found necessary, or as hereinafter set forth.

"The syndicate is to own all of the stock of the company. The company is to forthwith proceed with the laying of pipes and preparations for the manufacture and sale of gas on the necessary scale.

"The Queen City Construction Company, if desired by the syndicate, is to construct the plant and works of the company and receive compensation in the bonds of the company at par, the stock to be also issued to the Construction Company in accordance with the requirements of the statute, and after its legal issue to be returned to the syndicate.

"Yours very truly,                                      Herbert P. Bissell,
                                                        "John A. Kennedy,
                                                        "P. H. Griffin,
                                                        "Wm. C. Cornwell.

"The above proposition is accepted.
                                 "Queen City Construction Co., Limited,
                                        "J. Edward Addicks, Chairman."

This scheme contemplated paying for the Gas Company's stock by the issue of its own bonds, and diluting the security plentifully by increasing the capital stock to $2,000,000, and putting out $2,000,000 of bonds; both the stock and the bonds having behind them no more than $180,000 of property, even if reckoned at the highest estimate fixed by the original promoters, namely, the defendant and the other interested parties. This plan was practically abandoned, however, and early in the following month the People's Company was incorporated as a more suitable instrument to carry out the scheme that had been agreed upon. To understand the real effect of the agreements that are about to be quoted, it is important to bear in mind that at this time, as is conceded by his counsel, the defendant had "acquired practically all of the stock of the Construction Company," so that he was not only his individual self, but was at the same time the Gas Company and the Construction Company as well. This being the situation, what happened was as follows: On December 3, 1897, four agreements were made, which will be set out in full, although only two are of chief importance. The first was between the Construction Company and the directors of the Gas Company (acting for that corporation), of the first part, and the People's Company, of the second part. It contained these provisions:

"Whereas, the said the Queen City Construction Company, Limited, one of the parties of the first part, is the owner of all of the capital stock of the Queen City Gaslight Company, a corporation duly organized and existing under the laws of the state of New York, and now engaged in manufacturing and supplying gas for lighting and heating purposes in the city of Buffalo aforesaid, and the said Newland, Kirkover and Beard are the persons to whom

said stock was issued and in whose names it stands upon the stock books of said Queen City Gaslight Company; and

"Whereas, the said party of the second part has been organized and incorporated under the laws of the state of New York for the purpose of manufacturing and supplying gas in said city of Buffalo, as provided by section 60 of the transportation corporations law; and

"Whereas, it is the desire and intention of the parties hereto that the said party of the second part shall acquire, own and control all of the capital stock of the Queen City Gaslight Company, together with all of its property, rights, privileges and franchises:

"Now, therefore, this agreement witnesseth, that the parties of the first part, for and in consideration of the sum of one dollar to them each in hand paid, the receipt whereof is hereby acknowledged, and for and in consideration of the payments, conditions, agreements and obligations hereafter to be paid and performed, as is hereinafter specifically stated and agreed, do by these presents hereby agree to and with the said party of the second part as follows:

"First. The said parties of the first part hereby agree that on or before the 13th day of December, 1897, they will deposit in escrow in the Niagara Bank, of the said city of Buffalo, all of the capital stock of the Queen City Gaslight Company, with a sufficient assignment and transfer of all of the certificates or shares thereof to the said party of the second part, provided the order mentioned in the paragraph 'second' below, for the delivery of one million one hundred and eighty thousand dollars of bonds to the said Queen City Construction Company, Limited, is also deposited at the same time or prior thereto.

"The said parties of the first part hereby further agree that they will also deposit in said bank an abstract of title, together with tax searches, showing that all of the property, rights, privileges and franchises and stock of the said Queen City Gaslight Company are free and clear from all liens and encumbrances, claims or demands whatsoever, which said stock certificates, abstracts of title and tax searches the said party of the second part, its attorneys or agents, shall, as soon as the same are deposited, have the right to examine and approve.

"Second. The said party of the second part hereby agrees that it will, on or before the 13th day of December, 1897, duly deposit in said Niagara Bank, of Buffalo, an order upon the trustees named in the mortgage of the party of the second part herein mentioned, duly accepted by said trustee, for the delivery of said Queen City Construction Company, Limited, as soon as the same shall be engraved, issued and certified by said trustee, of one million, one hundred and eighty thousand dollars of the first mortgage five per cent. thirty-year gold bonds of the party of the second part, secured by a mortgage covering all of its property, rights, privileges and franchises, and further secured by a pledge of all the stock of the Queen City Gaslight Company now or hereafter issued, as well as a first mortgage duly executed by the Queen City Gaslight Company, covering and including all of the property, rights, privileges and franchises of the Queen City Gaslight Company, together with a certificate representing one million one hundred and eighty thousand dollars ($1,180,-000) of the capital stock of the said People's Gas Company, of Buffalo, or an order therefor, addressed to the treasurer thereof, and duly issued to the Queen City Construction Company, Limited, one of the parties of the first part, which said stock or order therefor and order for bonds, when so deposited, and mortgages securing said bonds, the said parties of the first part, their agent or attorney, shall first have the right to inspect, examine and approve, and when all of the said transfers, certificates and abstracts of title and orders and mortgages as aforesaid are so approved by the respective parties as aforesaid, the said capital stock of the said Queen City Gaslight Company, so deposited in escrow, shall thereupon forthwith be delivered to the trustee named in said mortgage, and when so delivered the said bonds and stock or the orders therefor, of the People's Gas Company, of Buffalo, shall thereupon be delivered to the said the Queen City Construction Company, Limited, one of the parties of the first part.

"It is hereby understood and agreed that the series of bonds, of which the bonds hereinabove described are to be part, shall be limited to a total issue of

ten millions of dollars ($10,000,000), in accordance with the terms and conditions of the said mortgage of the party of the second part to be given to secure the same.

Third. It is hereby further understood and agreed that the party of the second part shall also place and deposit with the said Niagara Bank, of Buffalo, an order for $218,000 of said bonds, without coupons for the first four years, in addition to the one million one hundred and eighty thousand dollars ($1,180,-000) thereof hereinbefore mentioned, directing the said trustees to deliver the same to the Queen City Construction Company, Limited, which said order shall be delivered to the said Construction Company, upon its delivering to the said Niagara Bank, of Buffalo, for the People's Gas Company, the coupons for the payment of the first four years' interest on one million dollars ($1,000,000) of the bonds of the said People's Gas Company to be issued to the said Construction Company as herein provided. It being the desire and intention of the parties hereto to have the interest on said one million dollars ($1,000,000) of the bonds of the party of the second part which are to be issued and delivered to the Queen City Construction Company, Limited, provided for and paid in advance for the first four years of the period of said bonds, the Queen City Construction Company, Limited, hereby agrees to accept the said additional two hundred and eighteen thousand dollars ($218,000) of said bonds in full payment of said four years' interest on the said one million dollars ($1,000,000) thereof, and also of the interest on the said two hundred and eighteen thousand dollars ($218,000) bonds for a like period.

"It being the purpose of this agreement to provide that the entire capital stock of the said Queen City Gaslight Company shall be acquired and owned by the said party of the second part, subject to the lien of said mortgage as aforesaid, in payment of which said party of the second part shall issue to said the Queen City Construction Company, Limited, one of the parties of the first part, one million one hundred and eighty thousand dollars ($1,180,000) of its bonds, and an equal amount of its capital stock, as hereinabove expressly stated and set forth.

"And the party of the second part hereby agrees that it will in good faith, either in its own name or in that of the Queen City Gaslight Company of Buffalo, proceed with all due and reasonable expedition with the construction of and will construct a good and sufficient plant in the city of Buffalo for the purpose of manufacturing and supplying gas therein; and in the event that it does not purchase, control and operate one or more of the gas plants now doing business in said city in the meantime, it will expend at least the sum of eight hundred thousand dollars ($800,000) in the construction and equipment of a gas plant as aforesaid within the next three years.

"It is mutually understood and agreed that the conditions, limitations and agreements herein contained shall extend to and bind the successors and assigns of each and all of the parties hereto."

In brief, so far as is now material, this agreement provided that the Construction Company (for which should be substituted in thought its owner, the defendant) should transfer to the People's Company all of the Gas Company's stock, which belonged absolutely to the defendant through his ownership of the Construction Company, and that the People's Company, in return for such transfer, should issue to the Construction Company (that is, to the defendant) its bonds, or an accepted order therefor, amounting to $1,180,000, secured by first mortgages upon all the property of the People's Company and of the Gas Company, and also $1,180,000 of stock in the People's Company. But, as it was recognized that there was no money and little property behind these bonds, and therefore that it might be inconvenient to pay the interest until the public could be induced to take a satisfactory share in the enterprise, the payment of interest upon $1,000,000 of the bonds was deferred for four years, and in lieu of the coupons for that period the Construction Company (that is, the defendant) agreed to accept

additional bonds to the amount of $218,000, also without coupons for four years. The total sum to be received by the Construction Company (that is, by the defendant) under this agreement was, therefore, $1,398,000 in bonds of the People's Company without coupons for four years, $180,000 in bonds with coupons, and $1,180,000 of its stock. For this consideration the Construction Company (that is, the defendant) agreed to part with all of the Gas Company's capital stock.

On the same day a second agreement was made between the Construction Company and the directors of the Gas Company (acting for that corporation), of the first part, and Griffin, Cornwell, Kennedy, and Bissell, representing a syndicate composed of themselves and others, of the second part, which provided as follows:

"Whereas, the Queen City Construction Company, Limited, one of the parties of the first part, is the owner of all of the capital stock of the Queen City Gaslight Company, a corporation of the state of New York, now engaged in manufacturing and supplying gas for lighting and heating purposes in the city of Buffalo, which said stock stands in the name of said Newland, Kirkover and Beard on the stock books of said gaslight company, and

"Whereas, the parties of the second part, heretofore and on or about the 12th day of October, 1897, made and entered into an agreement with the said Queen City Construction Company, Limited, acting for itself and as agent for all of the parties interested in the capital stock, property and franchises of the said Queen City Gaslight Company, and

"Whereas, the said parties of the second part, together with certain other persons, have duly organized and incorporated under the laws of the state of New York a corporation known as People's Gaslight & Coke Company of Buffalo, for the purpose of manufacturing and supplying gas, as provided by section 60 of the transportation corporations law, and it is the desire and intention of the said parties of the second part that the said People's Gas Company of Buffalo shall acquire and own all of the capital stock, rights, properties, privileges and franchises of the said Queen City Gaslight Company, and

"Whereas, the said People's Gaslight Company of Buffalo has entered into a contract in writing with the parties of the first part, which said contract bears even date herewith, to acquire all of the capital stock of the said Queen City Gaslight Company, and providing for the payment and delivery by said People's Gas Company of Buffalo to said Queen City Construction Company, Limited, of one million one hundred and eighty thousand dollars ($1,180,000) of the five per cent. thirty-year first mortgage gold bonds of said People's Gas Company of Buffalo, and for the further payment and delivery to said the Queen City Construction Company, Limited, as a part of the purchase price of all of the stock of the Queen City Gaslight Company, as aforesaid, of one million one hundred and eighty thousand dollars ($1,180,000) of the capital stock of said People's Gas Company of Buffalo, and

"Whereas, it is the desire and intention of the parties hereto to perfect and carry out the terms and conditions of the said agreement in writing, bearing date the 12th day of October, 1897, and

"Whereas, in furtherance thereof it is the desire and intention of the parties of the second part to purchase from said Construction Company, Limited, the said amount of the capital stock of said People's Gas Company of Buffalo, to be issued and delivered to said Construction Company as aforesaid, viz., One million one hundred and eighty thousand dollars ($1,180,000) of said capital stock, as provided for by said agreement, and also to purchase one hundred thousand dollars ($100,000) of the said bonds so to be issued as aforesaid:

"Now, therefore, this agreement witnesseth:

"First. That for and in consideration of the premises and of the covenants and agreements herein expressed, and of the mutual benefits to be derived by the parties hereto, and of the sum of one dollar, paid to each of the said parties of the first part by the said parties of the second part, the receipt whereof is hereby acknowledged, the said parties of the first part do by these presents

hereby agree to and with the said parties of the second part, their heirs, executors, administrators and assigns, as follows:

"The said parties of the second part hereby agree that they will pay unto the said Queen City Construction Company, Limited, the sum of one hundred thousand dollars ($100,000) in cash, for which they are to receive one hundred thousand dollars ($100,000) of the first mortgage gold bonds of said People's Gas Company of Buffalo, and one million one hundred and eighty thousand dollars ($1,180,000) of the stock of said People's Gas Company of Buffalo, the said sum to be paid when the said bonds and stock, or an order therefor, shall be delivered, which shall be as soon as the said stock and the said one million one hundred and eighty thousand dollars ($1,180,000) of bonds or orders therefor have been transferred to the said the Queen City Construction Company, Limited, by said People's Gas Company of Buffalo, pursuant to the agreement made between the said parties of the first part and said People's Gas Company of Buffalo, bearing even date herewith.

"Second. The parties of the second part, for themselves and for the said People's Gas Company of Buffalo, do hereby agree to and with the Queen City Construction Company, Limited, that they or the said People's Gas Company of Buffalo will hereafter issue and duly transfer or cause to be issued and duly transferred to the said Queen City Construction Company, Limited, shares or an amount of the capital stock of said People's Gas Company of Buffalo in addition to two hundred and ninety-eight thousand dollars of the bonds of said last named company, delivered to and retained by said Queen City Construction Company, Limited (being the two hundred and eighteen thousand dollars of bonds without coupons for four years, so delivered to said Construction Company, in full payment of interest on said two hundred and eighteen thousand dollars [$218,000] of bonds and on its one million dollars of said company's bonds for four years in advance, and the additional eighty thousand dollars of said bonds received and retained by the said Construction Company in excess of the said one million dollars of bonds), pursuant to the terms of this and of the other agreement herein referred to, bearing even date herewith, which said shares or amount of stock, so to be delivered to said Construction Company, shall equal the largest percentage or amount of said stock which shall be issued and delivered with any of said bonds hereafter sold by said People's Gas Company.

"It being mutually understood and agreed by and between the parties hereto that said stock so to be issued to said Queen City Construction Company, Limited, is in consideration of the acceptance by said Construction Company of the two hundred and eighteen thousand dollar bonds above mentioned, in payment of the interest as aforesaid in lieu of cash, and in consideration of all of the covenants and agreements hereinbefore contained.

"The said stock shall be delivered to said Construction Company as herein provided upon demand of said Construction Company at any time after any further sale by said People's Gas Company of Buffalo or its Construction Company of any of its bonds to investors.

"It is further mutually understood and agreed that said stock so to be issued to the Queen City Construction Company, Limited, shall be subject to any condition imposed or provision made with reference to the stock of said People's Gas Company providing for a voting trust with its usual conditions.

"It is hereby further agreed by the Queen City Construction Company, Limited, one of the parties of the first part hereto, that on or before the 13th day of December, 1897, it will cause to be deposited with the said Niagara Bank, of Buffalo, a certified copy of a resolution passed by all of the stockholders of the said Construction Company, Limited, consenting to and ratifying this agreement, accompanied by an affidavit of the secretary or treasurer of said Construction Company showing that all of the stockholders thereof were present and voted in favor of said resolution.

"It is further mutually agreed and understood that the conditions, limitations and agreements herein contained shall extend to and bind the successors and assigns of each of the parties hereto."

So far as we are now concerned, the substance of these provisions is this: The syndicate agreed to buy from the Construction Company

(that is, from the defendant) $100,000 of the bonds of the People's Company, with coupons, and the $1,180,000 of its stock, paying therefor $100,000 in cash, and agreeing to issue thereafter to the Construction Company (that is to the defendant) a bonus of a certain amount of stock upon either $218,000 or $298,000 of the bonds; the amount being somewhat uncertain, although $218,000 is probably the correct amount. The rate of the bonus was not fixed, but it was to be equal, at all events, to the largest bonus delivered to any future purchaser of the bonds. This, in connection with the first agreement, left the Construction Company (that is, the defendant) with $100,000 in cash, bonds of the People's Company to the amount of $1,218,000 without coupons, and $80,000 of bonds with coupons.

The third agreement, executed on the same day, was between the syndicate, of the first part, and the Construction Company, of the second part. It is of little importance in the pending controversy, but is nevertheless set out for the sake of completeness:

"Whereas, the said parties of the first part heretofore entered into an agreement with the party of the second part for the purchase of all the stock, franchises and property of the Queen City Gaslight Company of Buffalo, upon certain terms and conditions mentioned and set forth in an agreement in writing, dated October 12, 1897; and

"Whereas, it was agreed in and by said instrument that the amount expended up to the 1st day of October, 1897, by the said the Queen City Construction Company, for the construction and for furnishing materials for the plant of the Queen City Gaslight Company of Buffalo, was the sum of one hundred and eighty thousand ($180,000) dollars; and

"Whereas, it was further agreed that the parties of the first part would reimburse the said party of the second part for any amount expended for materials and construction in addition to the said sum of one hundred and eighty thousand dollars ($180,000); and

"Whereas, the said parties of the first part, together with others, have formed a corporation known as the People's Gaslight & Coke Company, of Buffalo, which said company has entered into a contract for the purchase of all of the property, stock, privileges and franchises of the said Queen City Gaslight Company:

"Now, therefore, for and in consideration of the premises and the payment by the said parties of the first part each of the sum of one dollar, the receipt whereof is hereby acknowledged, and in further consideration of the agreements herein expressed, the parties of the first part hereby agree that they will, either themselves or through the said People's Gaslight Company, reimburse the said party of the second part for any and all disbursements on account of the materials purchased and construction done for the Queen City Gaslight Company, which said materials have been furnished and construction done since the 1st day of October, 1897."

The fourth agreement was between the syndicate (eight persons being now named instead of four), of the first part, and the Construction Company and the defendant as an individual, of the second part. It is also of minor importance in this action, but is quoted because it was part of the transaction:

"Whereas, the said parties of the first part have heretofore formed a syndicate for the purchase of all of the stock, franchise and property of the Queen City Gaslight Company of Buffalo, and have organized a new company to which said stock, property and franchise have been transferred, said new company being known as the People's Gaslight & Coke Company of Buffalo; and

"Whereas, the said People's Gas Company of Buffalo has entered into an agreement bearing even date herewith, providing among other things for the

purchase by the said People's Gas Company of Buffalo of all the stock, property and franchises of the said Queen City Gaslight Company upon certain terms and conditions mentioned and set forth in said agreement, to which reference is hereby made, and which agreement also provides for the payment by the said People's Gas Company of Buffalo to the said the Queen City Construction Company, Limited, a corporation controlled by the said J. Edward Addicks, of one million one hundred and eighty thousand dollars of the first mortgage bonds of the said People's Gas Company of Buffalo, and one million one hundred and eighty thousand dollars of the stock of the said People's Gas Company of Buffalo; and

"Whereas, the said P. H. Griffin, W. C. Cornwell, John A. Kennedy and Herbert P. Bissell, acting for themselves and others, have entered into an agreement to repurchase from the said Queen City Construction Company, Limited, the said one million one hundred and eighty thousand dollars of the capital stock of the People's Gas Company and one hundred thousand dollars of the said first mortgage bonds, and to pay the sum of one hundred thousand dollars in cash for said stock and bonds, which said last-mentioned agreement also bears even date herewith, and to which reference is hereby made; and

"Whereas, the said the Queen City Construction Company, Limited, and the said J. Edward Addicks and others are desirous of protecting the amount of one million and eighty thousand dollars of said bonds which will remain in their hands against depreciation by reason of the failure of the said People's Gas Company to construct its plant or by reason of its entering into a consolidation or combination with other gas companies of Buffalo:

"Now, therefore, for and in consideration of the premises and of the sum of one dollar paid to, each of the parties of the first part by the party of the second part, and in further consideration of the mutual benefits, and the covenants and agreements expressed in the said contracts bearing even date herewith between the parties hereto, or some of them, and in the further consideration of the faithful performance by the said party of the second part of the covenants and agreements expressed and contained in said contracts, the parties of the first part do hereby agree as follows:

"The said parties of the first part hereby jointly and severally agree that in the event that any consolidation, union or other combination with, or sale, exchange or transfer of its stock, franchises or properties to or with any other gas companies in Buffalo or elsewhere shall be made by the said People's Gas Company of Buffalo or the said Queen City Gaslight Company of Buffalo, and in the event that such consolidation, union, combination, exchange, transfer or sale, if any, shall not be satisfactory to the Queen City Construction Company, Limited, or to said J. Edward Addicks, that then in either of said events the said parties of the first part will, on demand, purchase the said one million and eighty thousand dollars of bonds above mentioned from the said the Queen City Construction Company, Limited, or said J. Edward Addicks, and pay therefor the par value thereof with accrued interest in cash; and the Queen City Construction Company, Limited, and said J. Edward Addicks, parties of the second part, hereby agree that they or either of them will sell the said bonds to the said parties of the first part at the price aforesaid, in the event of such unsatisfactory consolidation, combination or sale as aforesaid.

"It being hereby understood and agreed that the said People's Gas Company of Buffalo will proceed with the construction in good faith of a good and sufficient plant in the city of Buffalo for the purpose of manufacturing and supplying gas, and in the event that there shall be no consolidation, combination or sale as aforesaid prior thereto, it is hereby further agreed that, when and as soon as the sum of eight hundred thousand dollars has been expended upon such plant in good faith, this agreement for the repurchase of said bonds shall be null and void, and the obligations hereby created shall be terminated.

"It is mutually understood and agreed that the conditions, limitations and agreements herein contained shall extend to and bind the successors and assigns of each and all the parties hereto."

These agreements were carried out, so far as the payments of money and transfers of securities are concerned, except that the evidence

leaves it doubtful whether the stock bonus on $218,000 of bonds, provided for in the second agreement, was ever issued. This point however, is not material, as the stock had no value.

The final result of these transactions was that the Delaware Company paid $1,000,000 in cash to the Construction Company (that is, to the defendant), and received therefor $1,212,000 in bonds of the People's Company, which were deposited in New York in the vaults of a trust company, in the names of the defendant and James G. Shaw, who was his brother-in-law, and was also the vice president and a director of the Delaware Company. These bonds had little intrinsic value. The issue was $2,100,000, and the plant and other property back of them was not worth one-third of this sum, even if appraised as worth all the money that had been put into the enterprise. Considering the property as income-producing and as security for an investment, it would not bear investigation for a moment. It was purely a speculative scheme, and, except in this aspect, its bonds were worthless. But it was a menace to the other artificial gas interests in Buffalo, and therefore had what one of the witnesses very aptly described as a "nuisance value," which afterwards turned out to be of some importance. The subject of value will be referred to again at the close of this opinion.

For the immediate purpose, it is enough to say that the Delaware Company had spent $1,000,000 in cash, which had gone into the treasury of the Construction Company (that is, into the pocket of the defendant, who had applied $830,000 of it to his own use), and had received in return a certain number of bonds of the People's Company, which I shall regard provisionally as worthless, leaving the question of their actual value to be considered hereafter. The defendant, in the guise of the two corporations that he owned absolutely, had profited largely by this transaction, and had applied a large part of the money to advance his individual purposes.

But the mere facts that he had been shrewd enough to carry through this somewhat involved transaction without putting much of his own funds at risk, and had emerged from the transaction with more than $800,000 of profit, are not sufficient to charge him with liability to the Delaware Company, or to its receiver, the complainant in the present bill. If the defendant had been a stranger to the Delaware Company, or if he had been merely a stockholder, without control or influence in its affairs, there would be no ground for the recovery that is now sought against him. Such recovery must rest upon proof that he occupied a position of confidence and responsibility in reference to the Delaware Company, and that he was faithless to his trust, in order that he might divert to his private gain a part of the corporate assets that were confided to his care.

And this brings me to consider the evidence concerning these additional questions, upon which I find the further facts to be as follows:

(19) During the period covered by the foregoing transactions the defendant was the absolute master of the Delaware Company. His power was unquestioned, not only over the selection and appointment of its directors, officers, and employés, but also over its financial and business management and the disposal of its assets.

(20) His control extended also to the stockholders' meetings. As already stated, the corporation was chartered with an authorized capital of $100,000, which was afterwards increased to $1,000,000,000, and of this vast total, shares of the aggregate par value of $250,000,000 were actually issued from time to time. Of the shares outstanding during the period involved in this controversy, the defendant at all times controlled a very large number, either by his personal influence and relations of one kind or another, or by virtue of proxies from other persons; and during all that period he controlled and voted, or caused to be voted, a large majority of the shares represented at each annual meeting of stockholders. He made it a practice to keep a collection of proxies, and before each annual meeting to get from the books of the company a revised list of stockholders. Where it appeared that stock had been transferred, he would write for a new proxy.

(21) The defendant had quorums fixed with reference to the number of his proxies in the following manner: Section 6 of the charter provided that a quorum at stockholders' meetings should consist of at least 50 per cent. of the capital stock. This was changed on March 1, 1895, when an amendment of the charter was passed at the defendant's instance, which provided that a quorum at such meetings should consist of so many stockholders as the by-laws might designate. Until October 23, 1900, article 2 of the by-laws provided that a quorum at annual meetings should consist of not less than a majority in interest of the stockholders. On that date he caused the directors to pass a resolution which purported to amend article 2 so as to provide that the quorum at stockholders' meetings should be determined by the board of directors before the meeting of the stockholders. In every year after 1895, however, the directors fixed the quorum on, or shortly before, the day set for the annual meeting, and the quorum thus fixed was in three of the years between 1895 and 1900, less than 50 per cent. of the stock outstanding; and, although the by-laws were not altered until October 23, 1900, the number of proxies which the defendant held immediately before the annual meeting in each year after 1895 determined the quorum which was fixed by the directors.

(22) He elected his own friends and associates as directors and officers, and they did whatever he asked them to do. They knew little or nothing about the manufacture and supply of gas, or about the Buffalo securities, but trusted everything implicitly to him. Many of them received large salaries, although the corporation had very little business to transact. The following details, which are taken in part from the complainant's brief, are abundantly supported by the evidence:

J. Frank Allee, a retail jeweler of Dover (afterwards a senator of the United States), was elected a director in 1895. He became a member of the board at the request of the defendant. When he was elected, he owned no stock; but 10 shares were put in his name to qualify him. He was a member of the executive committee, and became president in December, 1901. He was closely associated with the defendant in the factional politics of the state. So far as appears, he had had no experience in the gas business, or in the management of large affairs.

James G. Shaw, a cotton manufacturer of Newcastle, became a director in March, 1895, and continued in the board to the date of the

receivership. He was also a member of the executive committee. He was a brother-in-law of the defendant, became a director at his request, was nearly 70 years of age in 1897, and showed clearly by his testimony that he knew nothing about the gas business, and was not familiar with important affairs.

Newell Ball, of Bridgeville, a farmer, storekeeper, and director of a country bank, was elected to the board in October, 1895, at the suggestion of the defendant with whom he was on terms of social intimacy and of political alliance, and continued to be a director until the date of the receivership. He had no knowledge of the gas business, and very little, if any, experience in the affairs of large corporations, such as the Delaware Company.

Caleb R. Layton, a practicing physician of Georgetown, was a director from November, 1896, to November, 1902, except for a short interval before September 1897. He was asked to serve by the defendant, and consented as a friendly act to him, although he did not regard himself as well qualified for the position. He had no experience in managing gas companies, and the business of a large corporation was foreign to his training as a professional man. He was afterwards Secretary of State for Delaware.

Philo D. Beard, who was one of the promoters of the Gas Company, was elected a director in the fall of 1897, and died during the next summer.

J. H. Bateman served upon the board from November, 1897, to November, 1900. He was cashier of a bank in Dover, was closely associated with the defendant in politics, and managed the State Sentinel, a newspaper which the defendant published in the interest of his political faction.

George A. Kelly served as a director in 1895, and again from July, 1898, to November, 1902. W. H. Miller, John F. Donahoe, and C. F. Keller were connected with the company in official capacities; Miller as secretary or treasurer, Donahoe as secretary, and Keller as assistant secretary.

As already stated, the defendant, with the exception of the year from November, 1896, was president to December, 1901, when he was succeeded by Senator Allee. During the year from November, 1896, the president was John R. Bartlett of New York City, who gave the business of the company little, if any, attention. The defendant, who was then vice president, supervised and managed its affairs, just as he had done before. Although the Delaware Company was only a company holding certain securities nominally as investments, and was engaged in no active business, and although it paid no interest on its bonds or dividends on its stock after the spring of 1893, the directors and officers were paid large sums of money as salaries. From 1895 to November, 1897, each of the directors was paid $600 a year; and from November, 1897, to May 15, 1903, $2,500 a year. In 1896 the defendant received $10,000 salary as president; W. H. Miller received $5,000 as treasurer; C. F. Keller, $1,200 as assistant secretary; and John F. Donahoe, $2,400 as secretary, although he seems to have lived in Vermont and to have done little work. In February, 1897, the roll showed the following salaries: Bartlett, $10,000 as president; the defendant,

$10,000 as vice president; Miller, $5,000 as treasurer; Donahoe, $5,000 as secretary; and Keller, $1,200 as assistant secretary. In 1898 the defendant received $10,000 as president; Miller, $5,000; Donahoe $5,000; and Keller, $1,800. In the early part of 1898 the defendant's salary as president was advanced to $25,000 per year, and remained at that figure through 1898. George A. Kelly became clerk in 1898 at $3,600 per year. In 1899 the defendant received $25,000 as president; Miller, $5,000; Donahoe, $5,000; Keller, $1,800; Kelly, $3,600; and James G. Shaw, $3,000 as vice president. In 1900 and 1901 the salaries remained the same, except that in 1901 a new name appears—Kittinger, at $2,400. In 1902 Allee received $25,000 as president; James G. Shaw, $3,000 as vice president; Miller, $5,000; Donahoe, $5,000; and Keller $1,800. In 1903 Allee's salary as president was reduced to $5,000, while the salaries of Miller, Shaw, Donahoe, and Keller remained the same.

After the fall of 1896 the Delaware Company had no business for its officers and directors to transact, except the purchase of these Buffalo securities, and the purchase and sale of Amalgamated Copper and New Castle Gas stocks, and perhaps the holding of stocks in one or two other unimportant companies. That the officers and directors of the company were the merest automatons, acting solely as the defendant directed, and looking to him in the most complete confidence for orders, will appear conclusively by the following references to their testimony. I may add that the examiner's record upon this point should be read in its entirety, in order to appreciate adequately the complete surrender of the board to the defendant's will; but the references I am about to give will in some degree make the situation intelligible. To avoid prolixity, I shall merely give the substance of part of the testimony, instead of quoting the questions and answers in full.

Mr. Allee testified, inter alia, as follows: That, when the Construction Company applied in December, 1896, for a loan of $100,000, all the information he had about it came from the defendant. He did not know how far the defendant was interested in the company, nor what its assets were, except from general information derived from the defendant. That the loan at 4 per cent. without security was made "absolutely upon the advice of Mr. Addicks. We trusted him implicitly in these matters, and upon his advice it was done." That the board had no information about the loan, except what was given by the defendant, and "that the loan was made purely and solely because Mr. Addicks requested so." That in all matters relating to the purchase of the Gas Company's bonds "we were advised by Mr. Addicks and acted accordingly." That the board had no information concerning the Gas Company, except what was derived from the defendant and Mr. Beard, who was one of the original promoters. That he did not know, when he voted to buy $250,000 of the Gas Company's bonds, who the seller was, and that the executive committee had no advice "from any source other than Mr. Addicks as to the security back of the bonds." That he never visited Buffalo to investigate in regard to the bonds, and that "in all these matters he (Mr. Addicks) explained the thing to us, and we recognized him as the head of the company in

every way, and were guided by the information he gave us, and were satisfied with it, and so voted." That in reference to the purchase of the other $750,000 of the Gas Company's bonds "we acted in all of those matters in entirely the same way, on the advice of Mr. Addicks, the president of the company." That after the bonds were bought for $1,000,000 in cash none of the directors made any investigation about the Gas Company, not even when it appeared that no interest was being paid. That no investigation into the People's Company was made, "except what we received from Mr. Addicks," and that all that the board knew about this company also came from the defendant. That the substitution of the bonds of the People's Company for the bonds of the Gas Company was made because "Mr. Addicks, president of the company, advised it, and we acted accordingly." That the judgment of the board in this matter "was based upon the information given us by Mr. Addicks, and by the advice given by him that it was in the interest of our company it was done." That the defendant and Mr. Shaw were appointed trustees to hold the People's Company bonds, although the Delaware Company had a treasury of its own, "for the reason that was considered sufficient at the time, and given by Mr. Addicks and accepted by us, of course." That the defendant "always made a statement of the facts of the case, and we accepted them as so, and acted accordingly. * * * There was no one situated as Mr. Addicks was, as recognized by us as entirely as the head of the company, and we looked to him for the management of the company, and therefore, of course, there was no one else that could have advised us, that we would have considered in the matter, because there was no one else situated as he was." That no engineer was ever appointed to look into the condition of the Buffalo gas companies. That when the executive committee reported to the board that it had made investigations concerning any of the company's securities, this investigation "consisted (largely) in getting information and advice from Mr. Addicks."

From Mr. Ball's testimony it appears that from certain "glowing statements" made by the defendant and by Mr. Beard he formed what was evidently a very hazy idea about what the defendant was proposing to do. "The idea was formed in my mind that through those companies a controlling interest in the stocks of both of the companies could and would be obtained. That was the idea that was in my mind; just how I could not explain." He knew nothing about the Gas Company "except the information derived from the statements of Mr. Philo D. Beard and Mr. Addicks"; never investigated that company; did not know that the defendant or the Construction Company had any interest in the bonds; knew almost nothing about the People's Company; based his action in voting for resolutions concerning the purchase of the bonds upon "information obtained from Mr. Addicks"; and participated in the resolutions "at the request of Mr. Addicks, who requested me." Although he was a director to the date of the receivership, he never knew whether the Delaware Company had succeeded in obtaining "control of the Buffalo gas field," and took no independent means of acquainting himself with the facts, but stated "that what

[he] did in respect to all of those securities [he] did simply because [he was] requested to act by Mr. Addicks."

Mr. Shaw was even more dependent upon Mr. Addicks. He knew nothing about the Construction Company; was not even sure where its office was; did not know positively that the defendant was connected with it, although he had heard so "just in a general way, general talk." He made no inquiry about the company, or as to its business or its assets. As he frankly stated, "when I went into the board, I knew nothing about the gas business, and I told Mr. Addicks that, and I would have to rely upon him, and I relied upon Mr. Addicks in every particular, and anything he told me I believed him, and acted on anything he requested me to do." His testimony is full of illustrations of this confiding attitude. Being asked whether he knew how the bonds were secured he said: "No more than what Mr. Addicks told me. He told me that the security was a perfect security, and it was a good thing to be carried out, and we did it." Being asked, further, what information the board acted on when it agreed to the substitution of securities, he replied: "We got our information from Mr. Addicks. We were guided by him solely"—and added that he approved the exchange simply because it was recommended by the defendant, and that what he did at any time in respect to any of the company's securities "was done because Mr. Addicks, after talking the matter over, said it was the proper thing to do, and I knew no difference, so we did so."

These are by no means all the references that might be made, in order to support the proposition that the defendant was not only looked up to as the master of the corporate affairs, but was practically regarded as the corporation itself. They may suffice, however, to show what was undoubtedly the fact, that no one dreamed of opposing him, no one inquired independently about his schemes, or appeared even to desire information on the subject, and that he ruled in the counsels of the company as absolutely as if he had been without associates. The following brief extract from the testimony of W. H. Miller, the treasurer of the company from 1895 or 1896 to 1903, and for some time the treasurer of the Construction Company also, describes the situation exactly:

"Q. Are you able to state who was responsible for the organization of the company?

"A. J. Edward Addicks.

"Q. And who, if any one, controlled the company from that date on?

"A. J. Edward Addicks absolutely; no one else.

"Q. Was that true during the years subsequent to 1895 and down to 1903?

"A. Entirely so.

"Q. To what extent was that true at the time when he was not president of the company?

"A. It existed just the same; nothing done without his order."

A few more facts remain to be found before passing to the consideration of the legal questions that are involved.

(23) The defendant made it as difficult as possible for the holders of stock and bonds to find out what was being done with the funds of the Delaware Company. He directed the office employés never to give out any information as to the company's business under any cir-

cumstances. Until the receiver was appointed, although several attempts were made by the attorneys for holders of stock and bonds to gain access to the company's books, none was successful, owing to the defendant's opposition and positive instructions.

(24) Several changes were made in the time of holding the stockholders' meeting, and in the method of giving notice of these meetings. Section 6 of the charter provided that the directors should be elected annually at such place and time as the by-laws should designate; section 7 provided for 10 days' notice, by publication in two Wilmington newspapers; and article 25 of the by-laws required annual meetings of the stockholders to be held at the company's office in Wilmington on the first Tuesday in April at such hour as the directors should appoint, requiring, also, that a written or printed notice of such meeting should be mailed at least 10 days before the meeting to each stockholder of record at his address given on the books, and that notice of the time and place of meetings should be published in two Wilmington newspapers. On February 16, 1890, the directors amended article 25 of the by-laws, so as to provide that the annual meeting should be held on the third Wednesday of March in each year. On February 25, 1895, the directors again amended article 25 by changing the annual meeting to the first Monday of November. On March 1, 1895, the Legislature, at the instance of the defendant, amended section 6 of the charter so as to change the annual meeting to the third Tuesday after the first Monday in November, at such place and time as the by-laws should designate, and amended section 7 of the charter so as to provide that 10 days' notice of the time and place of the annual meeting should be given by publication in two newspapers published in the state of Delaware, instead of in the city of Wilmington. After the year 1895, notice of the stockholders' meetings was published in newspapers of small country towns, having limited circulation; and in consequence of this practice knowledge of these meetings from this source was likely to reach few, if any, of the stockholders. The defendant caused the annual meetings to be held at the unusual hours of 8:30 a. m. in 1900, and at 7:30 a. m. in 1901 and 1902, and caused the directors, before these meetings, to pass a resolution providing that the polls might be closed by a majority of the stockholders whenever a majority of the shares should have been voted for one ticket for directors. After 1892 no treasurer's report or financial statement was ever made at any stockholders' meeting. These changes in the charter and the by-laws were all made at the defendant's instance and by his procurement, and the result was greatly to hamper and impede any stockholder who might desire to obtain information concerning the company's affairs or to take part in the meetings.

The facts found in the foregoing paragraphs, beginning with No. 19, fully justify the following admissions of the defendant's counsel, which I quote from page 4 of his brief:

"While the broad and unqualified statements as to the control by the defendant of the property and directorate of the company are not proven by the evidence in the cause, it may be admitted that the guiding mind of the corporation was the defendant's; that the policies of the company were very largely his policies; that his opinions upon questions of company business were at all

times, from the organization of the company on, and regardless of the personnel of the board of directors, the most influential of anybody in the management of the company; that he was recognized by everybody connected with the company as being in closer touch with the greater questions of company policy and business than any other person; that his statements of fact were relied upon and constituted, from time to time, the basis of action by the company's board of directors. All these things naturally flow from the continuous interest which he took in the business of the company, from his greater knowledge of the business transactions of the company, from his official position as executive head thereof, and by the overwhelming vote of confidence in his management as indicated by the great number of proxies of company stockholders held by him."

To my mind these admissions do not adequately describe the situation. As it seems to me, the evidence proves overwhelmingly that the defendant was the absolute master in fact of the corporation, that his personality was dominant in all its affairs of every kind, that he dictated the personnel of its officers without contest or contradiction, and that the board of directors and the other officers were content merely to register his will. If he had owned the entire capital stock of the company—save the necessary qualifying shares—he could not have controlled it more completely. In short, the defendant and the Delaware Company were essentially identical, and the corporate machinery was merely used for the purpose of executing his plans under the guise of carrying out a formal corporate determination. The whole case is well summarized by the complainant's counsel, part of whose language I shall repeat at the risk of being tedious, in order to be sure that the situation has been made perfectly clear; for I agree with the argument that, as soon as the somewhat complicated facts are understood, the case is decided. I condense the summary into the following paragraphs:

(a) The circumstances surrounding and preceding the transactions of September and November, 1897, which resulted in obtaining $1,000,000 from the Delaware Company, ostensibly to buy the bonds of the Gas Company, clearly indicate that the defendant did not intend to make a legitimate investment for the Delaware Company, but that the object of the transaction was, by the adroit use of legal forms, to secure the Delaware Company's money for his individual purposes. It was this that came to pass, and it is fair to assume that the result was not due to chance, but to design. When the bonds of the Gas Company were bought in September and November, 1897, for $1,000,000 in cash, the only tangible asset owned by the Gas Company was a small gas plant, then nearing completion, which did not cost much, if any, more than $180,000. In form the transactions appear on the minute books of the Delaware Company as sales by the Gas Company of its own bonds to the Delaware Company, and prima facie, therefore, the proceeds of the bonds should have become part of the Gas Company's assets. But in point of fact the Gas Company never received any part of the proceeds of the checks and drafts of the Delaware Company, which were drawn to the order of the Gas Company's treasurer, and were immediately indorsed by him to the Construction Company, and collected by it for its own use. The money was thus, through the treasurer of the Gas Company as a conduit, simply transferred from the account of

the Delaware Company to the account of the Construction Company; and after the payments were made the Construction Company had received the purchase money for the bonds, and the Delaware Company, as the sole evidence of its payments, had nothing but an order on a trustee not yet appointed for bonds not yet issued or even provided for; and even when the bonds should be issued it had as security nothing except a plant worth no more than $180,000.

(b) The defendant asserts that the Construction Company received the money under a contract to erect a plant for the Gas Company. The contract was not produced, and no evidence of its existence is to be found on the minutes of the Construction Company; but, assuming that the contract existed, it is not to be presumed, without proof, that the Construction Company was entitled thereunder to receive either $1,000,000 in cash, or in the bonds of the Gas Company, for work upon which a disproportionately smaller sum had been expended. The effect of using the name of the Gas Company as the seller of the bonds was to conceal from the Delaware Company the fact that the money paid for the bonds would go to the use of the Construction Company, and of the defendant himself. The money obtained by these bond purchases was used by the defendant in speculative purchases of the income bonds of the Delaware Company and of the Butte & Boston copper stock. On September 13, 1897, the day when the first $250,000 was paid by the Delaware Company, the Construction Company opened an account with Brown, Riley & Co., a firm of brokers in Boston, and soon afterwards the speculative purchases began. The account of the Construction Company is credited, between September 15 and 24, 1897, with $330,000, which represents money paid to the brokers out of the $500,000 paid by the Delaware Company for the bonds of the Gas Company that were bought in that month. Part of the balance of this $500,000 was used by the Construction Company to repay the money that the Delaware Company had lent without security in 1896 for the purpose of building the small gas plant. During this month of September the brokers' account shows that income bonds of the Delaware Company were bought for the Construction Company at prices averaging 62; and toward the end of the same month they were sold to the Delaware Company at 80, a handsome profit thus being made by the Construction Company and by the defendant.

(c) Purchases of Butte & Boston copper stock were also begun in September, in the name of the Construction Company, and became active in the following November, as shown by the brokers' account. It was apparently for the purpose of aiding the defendant to deal in this stock that, on November 15, 1897, he caused the board of directors of the Delaware Company to authorize a further purchase of $500,000 of the Gas Company's bonds; for on that day this sum, represented by a draft on Brown, Riley & Co., who were brokers for the Delaware Company, as well as for the Construction Company and for the defendant, was transferred from the account of the Delaware Company to that of the Construction Company. Credit for this sum appears in the account of the Construction Company under date of November 16th.

(d) Thus the defendant had used $330,000 in September and $500,000 in November, both sums being money paid by the Delaware Company

for bonds to be issued by the Gas Company; but no part of this money had been applied to the use of the Gas Company or of the Construction Company, all of it having been employed in the effort to make individual profit for himself. By December 3d, however, the defendant came into possession of $1,218,000 bonds (or an order for bonds) of the People's Company, which had bought the stock of the Gas Company, and these bonds, or 1,212 of them (which were without coupons for four years and were intrinsically worthless as an investment), were afterwards delivered to the Delaware Company, in substitution for the bonds of the Gas Company, or of the order therefor. It cost the Construction Company little or nothing to acquire these bonds of the People's Company; and, after the defendant had caused the Delaware Company to agree to the substitution, he still had in his hands as clear profit, after deducting the cost of acquiring the minority interest in the stock of the Construction Company, the sum of about $890,000. The transactions through which this profit was made at the expense of the Delaware Company involved a clear disregard of the defendant's duty to that company, of which he was an officer and director, and, moreover, was in unquestioned control, and constituted a plain misappropriation of the company's funds to his individual use.

This condensed summary is, I think, amply justified by the findings of fact that precede it in this opinion, and, if the facts are true, it would be a waste of time to discuss elaborately the question whether the defendant is liable to account to the complainant in this suit. In my opinion, the unhesitating answer should be in the affirmative. His liability rests upon the fundamental principle that one who occupies a position of trust and confidence—such as the president, or a director, of a corporation—shall never be permitted to abuse his official position by dealing with the corporate property for his private gain. If he so deals, by whatever tortious devices, his acts are voidable if his trail can be followed, and he may be called upon to account for the profits that he has wrongfully made. If authority is needed for so plain a proposition, it may be found in Wardell v. Railroad Co., 103 U. S. 651, 26 L. Ed. 509; Fox v. Mackreth, 1 Lead. Cas. Eq. (4th Am. Ed., Hare & Wallace's notes) 237 et seq.; McCants v. Bee, 16 Am. Dec. 616, note; Wilson v. Brookshire, 9 L. R. A. 792, note; Hindman v. O'Connor, 13 L. R. A. 490, note; 4 Thompson, Corp. §§ 4672, 4674. As was said in Wardell v. Railroad Co., at page 658 of 103 U. S. (26 L. Ed. 509):

"It is among the rudiments of the law that the same person cannot act for himself, and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. Thus a person cannot be a purchaser of property and at the same time the agent of the vendor. The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and, 'constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' Marsh v. Whitmore, 21 Wall. 178, 183, 22 L. Ed. 482. The law, therefore, will always condemn the transactions of a party on his own behalf, when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted. Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule. They are not permitted to occupy a position which will conflict with the interest of par-

ties they represent and are bound to protect. They cannot, as agents or trustees, enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits."

A similar position is stated in Rice's Appeal, 79 Pa., on page 264:

"While the right of a stockholder to contract with his corporation and become its creditor is conceded as a general proposition, the right of a person controlling a corporation to contract with it rests upon entirely different principles, if it exists at all. Where a person has the actual control of a corporation, whether such control arises from the ownership of a majority of the shares or from his position or influence, and enters into a contract with such corporation, he is to be held to the most rigid good faith. The onus is upon him to show the fairness of the transaction, if. it is called in question. It is a principle too well settled to be now successfully controverted that the promoters, directors, or agents of a company shall not make a profit out of it in buying lands for it, or in dealing with it. This principle runs through all the fiduciary relations."

And in Finch Mfg. Co. v. Stirling Co., 187 Pa. 597, 41 Atl. 294— where, as stated in the syllabus, "the president of an insolvent corporation is present at a meeting of the directors of the company which votes to give a preference to another company, of which the president is also an officer and in which he is heavily interested, the mere fact that the president does not vote on the resolution does not rebut the presumption that the contract is void"—in delivering the opinion of the court, Mr. Justice Dean said, on page 600 of 187 Pa., and page 295 of 41 Atl.:

"Nor can we venture to say that under such circumstances, holding the responsible position of president of a corporation, he can relieve himself from the presumption of having secured the preference to the prejudice of the general creditors, by merely not voting. The transaction is consummated, not merely by his vote, but by the weight given to his advice or suggestion, and by his very prominence in the management. His opinion and request that the sale ought to be made is plainly apparent. The proposition to buy at the price named is made by the manufacturing company to the coal company, and accepted by the latter. Each director necessarily was aware, therefore, that their president thought the price fair, and that in his judgment the offer was one that should be accepted. In his presence they voted to accept. It is going too far, and might lead to great abuses, were we to hold that the mere declination to vote rebutted the presumption that the preference was fraudulent. Mere passiveness would not rebut the presumption; but he was more than passive. He made a proposition to buy, which was impliedly an invitation to the debtor to sell."

See, also, Russell v. Fuel Gas Co., 184 Pa. 102, 39 Atl. 21; Witmer's Appeal (Pa.) 15 Atl. 428; Bosworth v. Allen, 168 N. Y. 157, 61 N. E. 163, 55 L. R. A. 751, 85 Am. St. Rep. 667; Downs v. Rickards, 4 Del. Ch. 430; Brightly, Eq. Jur. (Pa.) §§ 97–101, and cases cited; Hill, Trustees (4th Am. Ed.) *535 et seq., and cases cited; and 1 Perry, Trusts (3d Ed.) §§ 207, 427.

As it seems to me, the defendant ·is in the position condemned by these authorities. He was an officer of the Delaware Company, and used his position as president and director to advance his own interests at the expense of the corporation. Of course, if he had put his hand into the treasury of the Delaware Company and had physically withdrawn for his own profit the money which the company has lost, no one would question his liability. Neither would it be questioned, if he had conspired with a majority of the board to do the acts and pass

the resolutions that have been done and passed, whereby the same result should be accomplished as by the coarser method of corporeal abstraction. And I see no reason why his liability should be doubted because the means actually adopted were different in kind, but were equally efficacious to transfer the property of the corporation to his personal use and profit. His control of the board was as complete as if they and he had been in collusion to accomplish a common object; and, with this uncontested power in his hands, he was the more bound to the utmost good faith and fair dealing. As has been shown, I think, he was absolutely unchecked by his fellow officers and directors. They looked to him, and to him alone, for information and advice. What he gave them was accepted without the slightest question or suspicion, and his wishes were carried into effect promptly and without change. No one can read the testimony without being convinced that real discussion in the board, or the exercise of individual judgment, was unknown. The directors and officers were either careless or ignorant to an almost incredible degree, and were apparently content to draw their satisfactory salaries and clothe his requests or suggestions in the formal garb of corporate action.

The defendant's counsel has made little effort to deny the relative position of the defendant and the board, and has made no effort to dispute the rule of law, if the facts are such as they have now been found to be. The only legal proposition for which counsel contends is—to use his own words—"that the primary decree of the court, if made against the defendant, must be simply for an accounting, and that the court is not at liberty, under the law or practice in equity, to at present find any sum which the defendant should be compelled to refund." I do not agree with this proposition. No doubt, if the liability to account should be wholly denied by a defendant, the issue thus raised must be first disposed of; and if an interlocutory decree is made that the defendant do account, the usual practice is to appoint a master. This, I think, may be said to be the invariable practice, if the dealings of the parties have been complicated, or if for any reason the convenience of the litigants or of the court would be promoted by such appointment. But there can be no dispute in the present case about the defendant's liability to account, if the facts are as they have now been found; and there is no complication in the dealings between the parties that calls for the aid of a master. A decree is about to be entered requiring the defendant to pay over a certain sum of money, and the single question remaining is: How much should he be decreed to pay? To answer this question, a reference to a master is not needed; but, even if it were desirable to have his assistance, it is purely a matter of discretion whether the appointment shall be made, or whether the simple account shall be stated by the chancellor himself. 1 Ency. Pl. & Prac. 103 note; 17 Ency. Pl. & Prac. 986, and cases cited; 2 Fed. Prac. (Garland & Ralston) § 263; 1 Foster, Fed. Prac. (3d Ed.) § 300. As was said by Chief Justice Marshall in Field v. Holland, 6 Cranch, 22, 3 L. Ed. 136:

"It was completely in the discretion of the court to ascertain this fact for themselves, if the testimony enabled them to ascertain it, or, if it did not,

to refer the question either to a jury or to auditors. There was consequently no error either in directing this issue or in discharging it."

And in Wheeler v. Billings, 72 Fed. 301, 18 C. C. A. 573, the Court of Appeals for the Eighth Circuit decided that:

"It is not necessary that an account decreed in a suit in equity should be stated by a master; but it is within the discretion of the court, if for any reason it deems it proper to do so, to state the account itself, after an examination of the testimony. * * *"

See, also, Head v. Head's Adm'r, 3 A. K. Marsh. (Ky.) 120; May v. May, 19 Fla. 388; 2 Beach, Eq. Plead. § 680.

Passing, then, to the last question, for how much should the decree be entered? I have come to the conclusion that, for the present at least, a final decree may be entered for the full amount claimed by the complainant, namely, $890,000, with interest from December 1, 1897. But I shall retain control of the decree for the purpose of diminishing the amount, if such action shall be found necessary. My reason is this: The Delaware Company exchanged the bonds of the People's Company for securities of the Buffalo City Gas Company— the corporation that took over the People's Company—or for other securities based upon the bonds. My examination of the testimony has not enabled me to ascertain the value of these securities (which it still owns), either at the time when the exchange was made, or their value at any subsequent date; and, if the defendant is entitled to have the value of these securities set off against the receiver's claim, I am not able at present to determine exactly how much deduction should be made. Moreover, the question whether the complainant is entitled to a decree for the entire profit made by the defendant, or whether the value of these securities should in equity be deducted therefrom, was not orally argued before me upon the final hearing, and is only slightly touched upon in the briefs. I am, therefore, unwilling to decide the point without giving the parties an opportunity to be heard, and I shall therefore ask counsel to assist me with an argument upon this question on Saturday, June 8, at 10 o'clock. If either party desires to take further testimony upon this point, they are at liberty to do so, and such testimony may be taken, upon five days' notice, either before the examiner, Henry B. Robb, or before any other person, either in Philadelphia or elsewhere, upon whom they may agree.

Meanwhile the final decree just indicated may be entered, without present abatement.